[No. 2658-2. Division Two. June 5, 1978.]

NELSON CONSTRUCTION COMPANY OF FERNDALE, INC., *Appellant*, v. PORT OF BREMERTON, ET AL, *Respondents*.

322

*Sam Baker, Bruce T. Rinker, Theodore Preg,* and *DeGarmo, Leedy, Oles & Morrison,* for appellant.

*Walter M. Hackett, Jr.,* and *Arthur, Hackett & Cyr,* for respondents.

SOULE, J.—Nelson Construction Company of Ferndale, Inc. (Nelson Construction) appeals from the trial court's dismissal of its action against the Port of Bremerton for increased costs of dredging in Puget Sound at the site of a planned Port Orchard Marina. We affirm the dismissal.

In September of 1971 the Port hired Reid, Middleton & Associates, Inc. (RMA), an engineering firm, to prepare detailed plans and specifications for construction of the proposed marina and to perform related engineering services. The project was designed to include a parking lot created from fill dredged up from a designated underwater area nearby.

RMA's application for a permit from the State Department of Fisheries contained the following language:

DESCRIPTION AND PROCEDURE OF WORK AND EQUIPMENT TO BE USED: Hydraulic dredging of harbor area and placement of dredged material behind berm for parking area fill.

This language was unknown to the contractors bidding for the dredging job, and the Fisheries permit did not limit the method of dredging to be allowed.

The Port also employed a soils engineering firm, Dames & Moore, to conduct a study of the soils in the project area. Their report was prepared in part from underwater borings in and near the area to be dredged. The report, submitted to RMA on August 24, 1973, contained the results of two test borings in the dredging area which failed to reveal any rocks larger than 2 inches in diameter. The report, however, cautioned that:

The recent marine sediments which occur just below the mudline in the dredge area may be satisfactorily excavated with a suction dredge. However, excavation of the glacially consolidated soils underlying the marine sediments will require a cutterhead–type dredge.

Excavation of the glacial soils is expected to be slow and difficult to accomplish and rocks of varying size may be encountered.

RMA subsequently prepared the plans and specifications for the project which were submitted to prospective bidders

for the dredging task. Included were the test boring data and a drawing indicating the presence of two boulders larger than 6 feet in diameter. The existence of the Dames & Moore soils report was not mentioned to prospective bidders, but section 2.05 of the specifications provides in part:

> Soil borings indicate the presence of glacial consolidated soils within the area to be dredged. It is anticipated that special equipment will be required to remove this material.

A hydraulic dredging company, Marine Construction & Dredging, Inc. (Marine), was interested in bidding the dredging subcontract for the project. Marine's general manager, Kenneth Youngsman, conducted a prebid investigation of the dredging work, including the plans and specifications and test boring data. Mr. Youngsman, who had been involved with previous dredging in Puget Sound, called Lloyd Nelson, RMA's project manager for the job. Mr. Youngsman wanted clarification of the size of gravel likely to be encountered and the "special equipment" that might be needed to remove the "glacial consolidated soils." Mr. Nelson knew Marine was a hydraulic dredging company. He informed Youngsman the term "special equipment" meant a cutterhead attachment on a hydraulic dredge, a device Marine had for use.[1] Nelson referred Youngsman to Mr. Larry Morrison of Dames & Moore for further information about the subsurface. Morrison told him the gravel did not exceed 2 inches. Youngsman did not ask if a soils report had been prepared, and there was conflicting testimony as to whether Nelson or Morrison told him about the Dames & Moore report.

The specifications in the hands of Mr. Youngsman cautioned in section 2.02 as follows:

---

[1] Hydraulic dredging is the least expensive kind and is done by dragging a pipe along the bottom of the body of water to suck up the material. Sometimes a cutterhead is installed at the end of the pipe to cut through hard material and loosen it so it can be sucked up. Hydraulic dredging is ineffective to suck up rocks larger than the pipe opening, which usually must be dredged with a clamshell dredge.

Exploration to determine the character of material to be removed by dredging has been performed by the Owner, and the results of the borings are shown on the drawings. The results of the exploration are submitted for information only, and the Owner assumes no responsibility for the accuracy of the exploration or the resulting data, nor does the Owner guarantee that no other materials will be encountered, or that the proportions of materials will not vary. It will be the responsibility of the Contractor to make such investigations as he feels necessary before the time of bidding on this work.

Mr. Youngsman again called Mr. Nelson to inquire about rocks in the dredging area that could not be dredged hydraulically, specifically including the two large rocks drawn on the dredging plans. As a result, Mr. Nelson issued the following addendum No. 2 to the contract specifications:

"Existing rocks in the dredged area, as noted on the plans, shall be removed. Payment for said removal shall be incidental to the unit price bid per cubic yard for "Dredging to Specified Limits in Harbor." If other rock is encountered during the dredging operation which cannot be handled by normal suction dredging procedures, payment for the removal shall be negotiated on a force account basis."

The phrase "force account" in the addendum means on a time and materials basis.

Mr. Youngsman described this addendum as a "rock clause" of the sort sometimes inserted in a hydraulic dredging contract to provide for extra compensation if rocks appear which must be dredged by another method.

Apparently satisfied with the situation, Mr. Youngsman then submitted Marine's bid of $2.08 per yard for the dredging subcontract to Nelson Construction. Those parties agreed on a subcontract, with this exclusion: "Large rocks to be removed by Nelson Construction Company."

Nelson Construction thereupon incorporated Marine's bid for dredging into its bid for the overall marina project. Nelson Construction was awarded the contract, and on February 17, 1974, Marine began dredging.

During the second pass of the dredge, difficulties arose. Rocks were encountered with unexpected frequency, and many would not pass through the suction pipe and cutterhead. The cutter teeth were replaced, but still the required depth of dredging could not be achieved. Marine alleged to Nelson Construction and RMA that these conditions made it unfeasible to proceed with hydraulic dredging, and suggested that clamshell dredging be used. Marine ceased work after attempting a third pass. At that point, the general contractor sent a diver to inspect the dredging area, and he found some six boulders and numerous "cobbles" up to 24 inches in diameter. The diver reported, however, that hydraulic dredging could be used with a clamshell doing the "final touches."

On February 25, Nelson Construction wrote a letter to RMA claiming impossibility of performance and erroneous specifications. The letter demanded that further dredging be handled on a force account basis, as contemplated by addendum No. 2.

The Port and Nelson Construction did not negotiate at that point about additional costs. Instead, Nelson Construction hired a clamshell dredge to complete the job, and claimed that its increased costs due to the necessity of turning to the clamshell method amounted to $109,348.70. The Port denied the claim.

At the close of Nelson's case in its suit upon the claim, the court applied CR 41(b)(3) and dismissed the cause of action on the ground that plaintiff had failed to prove a prima facie case. The Port's third-party complaint against RMA and Dames & Moore was also dismissed. This appeal followed.

We are confronted with the threshold problem of whether the trial judge in dismissing the action was in fact weighing the evidence or was resolving all doubts in favor of plaintiff. If the court viewed the evidence most favorably to plaintiff, we are limited to a determination of whether there is any evidence or reasonable inference therefrom to establish a prima facie case as a matter of law; if, however,

the court in deciding the motion weighed the evidence and entered findings of fact, we will accept the findings if they are supported by substantial evidence. *N. Fiorito Co. v. State,* 69 Wn.2d 616, 419 P.2d 586 (1966); *Richards v. Kuppinger,* 46 Wn.2d 62, 278 P.2d 395 (1955). If findings of fact are entered, as they were in this case, we look to see if they support the conclusions of law and the judgment.

There is some confusion as to which approach was followed in this case, because the trial judge in reviewing his findings stated orally, at the urging of plaintiff's counsel, that he "must view the evidence in a light most favorable to the plaintiff and I have ruled on the grounds of insufficiency of the evidence . . ." We note as a matter of law, however, that the entry of findings and conclusions strongly indicates a weighing of the evidence, *Seattle–First Nat'l Bank v. Hawk,* 17 Wn. App. 251, 562 P.2d 260 (1977), because if the court accepts the plaintiff's evidence in its most favorable light and draws a legal conclusion that there is no prima facie case, then no findings or conclusions are necessary or required. *N. Fiorito Co. v. State, supra.*

As in *Fiorito,* the trial judge's oral opinion augments the clear impression from the findings that he did in fact weigh the evidence and resolve conflicts—in some instances against the Port.

Nelson Construction contends it established a prima facie case under each of three different legal theories. Although we have determined the proper test is whether substantial evidence supports the findings, we will use Nelson's three theories as the basis for our discussion.

1. Did the Port breach a duty to volunteer the information in the Dames & Moore soils report that excavation was expected to be slow and difficult and "rocks of varying sizes may be encountered?"

The Port would have breached a duty to disclose all information in its possession with reference to rocks on the harbor bottom only if it willfully withheld such information peculiarly within the scope of its own knowledge and not readily obtainable by Nelson Construction, or failed to give

a complete and truthful answer to a broad inquiry by plaintiff regarding dredging conditions. *Simpson Timber Co. v. Palmberg Constr. Co.,* 377 F.2d 380, 385 (9th Cir. 1967). *See also Lincoln v. Keene,* 51 Wn.2d 171, 316 P.2d 899 (1957).

The evidence supports the court's finding of fact No. 8 that the information in the Dames & Moore report would have been given willingly to Mr. Youngsman had he requested it of RMA's Mr. Nelson. Lloyd Nelson testified, in fact, that although he did not have a clear recollection, he did probably mention the soils report to Mr. Youngsman during their telephone conversation. In any event, there is no evidence of a willful withholding of the report.

Furthermore, the Port was not in possession of superior knowledge even if the evidence is viewed most favorably to plaintiff. Mr. Youngsman knew of the general substance of the pertinent portion of the report by other means. Through his investigation he learned that glacially compacted or consolidated soils would be encountered and that special equipment in the form of a powered cutterhead would be needed. As for the possibility of encountering large rocks, the addendum covered that contingency by providing that payment would be negotiated on a force account basis for rock which could not be removed by normal suction dredging. This addendum notified Nelson Construction of the possibility that such rocks might be encountered in addition to the two boulders on the diagram. We find no prejudice to Nelson due to the alleged failure of RMA to volunteer the contents of the Dames & Moore soils report.

2. Did the Port mislead Nelson Construction to believe that the hydraulic method would be adequate to accomplish the dredging for the marina project?

█ The general rule is that where plans or specifications lead a public contractor reasonably to believe that conditions represented therein do exist and may be relied upon in bidding, he is entitled to compensation for extra expense

incurred as a result of the inaccuracy of those representations. *Dravo Corp. v. Municipality of Metropolitan Seattle,* 79 Wn.2d 214, 484 P.2d 399 (1971). The liability is premised upon the contractor's reasonable reliance upon inaccurate representations, and the reliance will be deemed reasonable if the contractor has made a reasonable investigation under the circumstances. *Robert E. McKee, Inc. v. Atlanta,* 414 F. Supp. 957 (N.D. Ga. 1976).

In the instant case, the court found as a matter of fact that Mr. Youngsman was alerted by the bid specifications to the possibility of difficult soil conditions and that reasonable prudence dictated that he should have questioned Mr. Nelson and Mr. Morrison of Dames & Moore further about those conditions. There is substantial evidence to support this finding.

Moreover, even if we were to view the evidence most favorably to plaintiff, the representations made were not inaccurate. Section 2.05 of the specifications informed the bidders of the glacial consolidated soils, and the addendum suggested that other rocks might be encountered which could not "be handled by normal suction dredging procedures" and provided a special means of compensation for their removal. Thus, while we agree the Port anticipated that the bulk of the dredging could be accomplished hydraulically, it is clear also that the Port disclosed the existence of two boulders as well as the possibility that dredging would be difficult, and was prepared to allow additional payment on a time and materials basis. We do not agree that the Port misrepresented the condition of the soils to the detrimental reliance of Nelson Construction.

3. Is Nelson Construction entitled to recovery on the theory of "changed conditions" in the dredging project?

Nelson defines "changed conditions" as ones which are unexpected because either they varied from those indicated in the contract documents or reasonably could not have been anticipated. Recovery on this theory may be based, in appropriate circumstances, either on a "changed conditions" clause in the contract, *Bignold v. King County,*

65 Wn.2d 817, 399 P.2d 611 (1965), or when such substantial changes are not covered by the contract. *V.C. Edwards Contracting Co. v. Port of Tacoma*, 83 Wn.2d 7, 514 P.2d 1381 (1973).

The trial court found that the addendum was not a changed conditions clause. With respect to the unknown extent and size of rocks to be encountered which plaintiff claims prejudiced him, however, the clause has the same effect. It provides for additional compensation if rock is encountered which cannot be handled by normal suction dredging. Nevertheless, this does not necessarily mean that Nelson Construction may rely on the addendum for recovery.

We do not perceive the facts of this case as involving changed conditions. The alleged changed conditions come down to the fact that more large rocks incapable of being dredged by the hydraulic method were encountered than Marine's Mr. Youngsman had anticipated. As we have observed, the specifications informed bidders of the presence of "glacial consolidated soils," and that "special equipment will be required to remove this material." Preliminarily, Mr. Nelson of RMA told Youngsman that "special equipment" meant a cutterhead attachment. Upon further inquiry by Youngsman as to the possibility of encountering rocks that could not be dredged hydraulically, addendum No. 2 was issued to cover this situation. Mr. Youngsman admitted in testimony that he knew glacial material can contain rocks of varying size.

While Mr. Youngsman subjectively may not have expected to encounter large rocks with the frequency in which they appeared in areas of this project, it is clear to us that the actual conditions were not reasonably unanticipated or at variance with the contract.

Nelson Construction's wound appears to us to have been somewhat self-inflicted, because it did not proceed properly to take advantage of the addendum allowing extra compensation in the event some rocks had to be removed by other means. Rather than negotiating with the Port for such

removal on a "force account" basis, Nelson Construction notified RMA that suction dredging would not work, proceeded to engage a clamshell dredge to complete the job, and then billed the Port after the fact for the completion of the job by that more expensive method. The contractor did not obtain, or attempt to obtain, the Port's approval of a price for the removal of unknown rock on a "force account" basis. Under the procedure outlined in the contract addendum, Nelson Construction was obligated to go to the Port and obtain agreement on compensation before proceeding with a substitute method.

Appellant asserts that it did attempt to negotiate but that representatives of the Port had completely rejected requests for increased costs. The portions of the record to which we are referred relate to a discussion between Brown, the dredging superintendent for the dredging subcontractor, and Ames, who was RMA's representative and as such also the inspector for the Port. That discussion related to the request for assurance that the Port would pay for such hydraulic dredging as could be accomplished even if it could not be completed to the specified depth. Mr. Ames said that he could not guarantee payment, which was understandable since he obviously was not the ultimate authority on matters of payment. This conversation did not relate to negotiations for a "force account" basis of payment for rock removal.

The necessity for negotiation is all the more apparent because the evidence indicates that hydraulic dredging by Marine's equipment would have been feasible in some areas of the project, and that clamshell dredging was not necessary for the entire job. Moreover, plaintiff is not entitled to recovery at clamshell rates for the work that could have been done hydraulically. In this regard, the contractor did not sustain its burden of segregating the expense of dredging up material which was or could have been dredged by the hydraulic method from that incurred where the clamshell method was necessary.

We find substantial evidence in the record to support the court's findings, and therefore, we cannot substitute our own judgment. *N. Fiorito Co. v. State, supra.* The judgment of dismissal is affirmed.

REED, A.C.J., and PETRIE, J., concur.

Reconsideration denied June 29, 1978.

Review denied by Supreme Court November 17, 1978.