[No. 79440-5. En Banc.]

Argued May 8, 2007. Decided October 11, 2007.

*In the Matter of the Dependency of* HENRY SCHERMER.

STEPHEN SCHERMER ET AL., *Respondents*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Petitioner*, HENRY SCHERMER, *Respondent*.

928

*Robert M. McKenna*, *Attorney General*, *Trisha L. McArdle*, *Senior Counsel*, and *Christian A. Williams* and *Sheila M. Huber*, *Assistants*, for petitioner.

*Rachel Levy* (of *TeamChild*) for respondent parents.

*Gregory C. Link* (of *Washington Appellate Project*) and *Cheryl D. Aza* (of *Expat-CAPE*), for respondent minor child.

¶1 MADSEN, J. — The State of Washington challenges a Court of Appeals decision reinstating a dependency petition filed by Stephen and Margaret Schermer on behalf of their son, Henry. The petition alleged that Henry was dependent under RCW 13.34.030(5)(c), in that he "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." At the dependency hearing, the parents presented evidence that Henry requires two to three years of inpatient residential treatment to deal with sexually deviant behavior and other mental health issues. At the time, Henry was living in an out-of-state residential treatment facility. His parents testified that Henry would be released from the facility within two weeks because they could no longer pay for his treatment. They further stated they could not safely supervise Henry in their home, and they were unwilling to allow him back, primarily because of their fear that he would carry out his threats to kill his parents and two younger siblings, and/or commit sexual offenses. The trial court dismissed the petition on a CR 41(b)(3) motion. The court concluded there was insufficient evidence to establish dependency because Henry was currently safe at the treatment facility and his parents could finance six additional months of inpatient care if they sold their family home. The Court of Appeals reversed, holding that the parents established a prima facie case for dependency, and remanded for a full evidentiary hearing. We affirm the Court of Appeals.

## FACTS

¶2 Henry was born on February 7, 1990. Henry had difficulty learning and socializing with other children, and

his mother home-schooled him for a time. In 2003, when Henry reached adolescence, his behavior took a dramatic turn for the worse. He began having night rages and bouts of weeping that lasted for hours. His parents sought professional help. Henry got progressively worse, however. He began expressing suicidal thoughts and cutting himself. His parents took him to the hospital, and he was admitted for inpatient psychiatric treatment at Overlake Hospital. He began hearing voices, had hallucinations, and became increasingly frightened, angry, and aggressive. He was suspended from school for fighting with his peers. His treatment providers prescribed various medications, but none seemed to work effectively.

¶3 Over the course of 2003, Henry was hospitalized six times for inpatient psychiatric care, each stay lasting about a week. When Henry was at home, the Schermers complied with the advice of his physicians to minimize light, noise, and other irritations within the home, including keeping their younger son away from him. They also locked up items he might use to hurt himself.

¶4 Henry's symptoms continued to worsen, however. He became hateful and threatening to his siblings. After Henry's second or third hospitalization, his mother could no longer sleep while Henry was in the home. She did not trust Henry and feared that he would harm the two younger children. Henry is six feet one and weighs about 240 pounds.

¶5 Henry began directing his rage at his parents. He told them voices were telling him to kill his family and himself. He threatened to kill his tutor at school. The Schermers were unable to leave him at home alone.

¶6 On one occasion in mid-2003, Henry became highly agitated. He sat in a chair a short distance from a kitchen counter, with tightly clenched fists, staring intently at a block of kitchen knives. After about a half hour of coaxing from his parents, he told them voices were telling him to kill them all with one of the kitchen knives. His parents took the threat seriously and were "extremely scared" because

Henry seemed "out of control." Verbatim Tr. of Proceedings (VRP) (Sept. 8-9, 2005) at 21. They took him to the hospital and again admitted him for treatment. He was admitted the next month after voices again told him he should kill his family. At the dependency hearing, his father testified, "He had the specific day based on the phase of the moon that he was supposed to do it with whatever costume he was supposed to wear when he did it." VRP at 22.

¶7 In January 2004, the Schermers sent Henry to a residential care facility in Idaho. He remained there until May 2004. While he was away, the Schermers' then five-year-old son disclosed that Henry had exposed himself to him. When confronted with this information, Henry admitted it was true. During counseling sessions, he admitted exposing himself to three other young boys while he was at home.

¶8 The incidents were reported to the police by both Henry's counselor and his parents, but neither Child Protective Services nor the police investigated the matter.

¶9 In May 2004, Henry was moved to Red Rock Canyon School in Utah to receive behavioral modification therapy. His parents visited him every six weeks and participated in weekly therapy sessions via telephone. His behavior seemed to be improving. But in January 2005, Henry was found in a sexual encounter with a peer. After further inquiry, his counselors discovered he had had sexual relations with a number of peers. His therapists concluded Henry was displaying sexually predatory behavior and grooming other children to engage in sexual activities. The facility discharged him because it was not licensed to deal with sexually aggressive youth. Henry's therapists advised the Schermers it was not safe to bring Henry home. They helped them find a different treatment facility that would be capable of dealing with such issues.

¶10 In January 2005, Henry was transferred to the Birdseye Boys Ranch, run by Heritage Youth Services. The professionals at that facility advised Henry's parents he

required two to three years of intensive residential treatment, and that it was not safe for him to return home.

¶11 In January 2005, the Schermers contacted the Department of Social and Health Services (DSHS) for help because they realized they would soon exhaust their financial resources and would be unable to keep Henry at the residential treatment facility. They provided DSHS with Henry's medical records, said they were unable to care for him in their home, and asked DSHS to provide an out-of-home placement for Henry. DSHS declined. According to the Schermers, DSHS told them Henry's situation was not severe enough to warrant out-of-home placement and that their only remedy was to bring him home. They stated DSHS offered only the possibility of respite care and door alarms if Henry returned home. At the dependency hearing, a DSHS social worker testified that he declined the out-of-home placement request because he did not view Henry's situation as "an emergency," and Henry did not otherwise satisfy the department's criteria for voluntary foster care placement. VRP at 140.

¶12 In June 2005, the Schermers filed a dependency petition, alleging Henry was a dependent child under RCW 13.34.030(5)(c). Following a shelter care hearing, the court ordered Henry to remain in his parents' custody. The court appointed Henry a guardian ad litem and an attorney. The court ordered DSHS to arrange for the Schermers to meet with Second Chance, a social service agency, for an assessment "to determine the conditions under which the child may safely return home." Clerk's Papers (CP) at 22.

¶13 Following the evaluation, the Second Chance provider reported to DSHS:

> Mr. & Mrs. Schermer made it quite clear that they have no intention of having their son, Henry, return home. They do not feel that they can adequately supervise him nor do they want to place their other children at risk for sexual or physical abuse. It is their hope[ ] that the Snohomish County juvenile court will grant an order for their petition to have the state of Washing-

ton take Henry into custody. At this time, they are not willing to accept in-home services as offered by my agency.[1]

CP at 17.

¶14 On September 8, 2005, the court held an evidentiary hearing on the dependency petition. The court heard testimony from the Schermers, Henry, Vicky Britt, the family therapist, and James Kairoff, a DSHS social worker. After Henry's father testified, the court allowed Henry to amend the dependency petition to include an additional allegation of abandonment, under RCW 13.34.030(5)(a).

¶15 Both parents testified as to Henry's psychological problems and their efforts to care for him. Both expressed their belief that it would not be safe for Henry to return to their home and stated they were unwilling to allow him to do so. Stephen explained that Henry's condition "progressively got worse" while at home and that since he left, it had become apparent that Henry has "much deeper and harder to deal with issues than we even knew were there." VRP at 33. He said he was not capable of taking care of Henry because he was gone most of the day and was not available to monitor him.

¶16 Stephen testified that based on his recent conversations with Henry and with his treatment providers, he felt it would not be safe for Henry to return home. He testified that even if he was at home and able to monitor Henry, he did not feel capable of physically restraining him if his

---

[1] The in-home services offered by the Second Chance provider, and rejected by the Schermers, included:

assessing and addressing safety concerns in their household, developing and implementing a clear and specific safety and supervision plan and rules for healthy boundaries in and outside of the home, developing a system that enforces limits, structure and routine, educating the family around cycles of sexual abuse and how it relates to their personal life, providing parent education on issues of sexual offending and relapse prevention, connecting Henry with individual and group sex offender counseling, providing Henry with sex offender specific assignments to be completed on a weekly basis with support from a case aide, navigating the system in the Edmonds School District to enroll and support Henry in a classroom setting, and facilitating monthly team meetings including the family and other service providers.

CP at 17.

aggressive behaviors resurfaced. He testified that his wife, likewise, would be unable to physically restrain Henry.

¶17 Stephen testified that he was two months behind on the bills to Henry's current treatment facility and that Henry would be released from the facility within about a week. He testified that he was unable to take Henry back home and that he had been unable to find an alternate placement for him.

¶18 Vicky Britt was Henry's therapist from the spring of 2003 until he went to Idaho in January 2004. She also provided therapy to Margaret and Stephen. Britt testified that Margaret had been traumatized by Henry's threat to kill the family while they slept and that she remained extremely fearful, notwithstanding intensive therapy on the issue. Britt further testified that Margaret's fear that Henry would harm their younger son was so extreme that "she can't think of them even being in the same place without her needing to be on watch twenty-four/seven. And she couldn't tolerate that." VRP at 114. Britt stated that Margaret lacked short-term memory, was unable to process information well, and became "paralyzed" when attempting to deal with Henry's problems. "She just can't think of bringing him home. She can't even try to process what steps could or may be done to get Henry back home. She just shuts down." VRP at 111-12.

¶19 Margaret testified that she did not trust Henry. She said living with Henry was like living with a "terrorist." VRP at 180. She testified that she did not believe she or her children would be safe if Henry was in the home and that she was unable and unwilling to care for him as a parent. She also said, however, that she did not intend to cut off contact with him. She said the reason she and her husband sent Henry to Idaho was because "I was terrified of the state system at that time" but that she was turning to the State for help because "[w]e don't have any choice now." VRP at 189, 190.

¶20 Henry testified that he knew his parents were unable and unwilling to take him back home. He said he

agreed with his parents that neither he nor his siblings would be safe if he were to live at home. He testified that he would be willing to live wherever DSHS placed him and to continue in whatever counseling was necessary.

¶21 As to the Schermers' financial resources, Stephen testified that the family was "on the verge of bankruptcy" and could no longer finance his son's residential treatment. VRP at 40. He said they had spent $130,000 out-of-pocket to care for Henry since his troubles arose. They paid these expenses, in part, by taking out a home equity loan for the maximum amount allowable ($50,000) and borrowing $21,000 from Margaret's father.

¶22 Stephen is the sole financial provider for the family. He works 40-50 hours per week and cannot significantly increase his wages. Margaret had not worked outside the home since Henry was in third grade. Her therapist testified that she was currently unable to work outside the home due to her own mental health issues.

¶23 At the close of evidence, DSHS moved for dismissal under CR 41(b)(3). The trial court granted the motion. In its oral ruling, the trial court stated:

> The Court does not believe that the appropriate question is, can the child safely be in the home. The appropriate question is the question posed by the statute, which is, does Henry have no parent capable of adequately caring for him.

> And the answer to that question from the evidence here today is in the negative. The father testified [] that today, September 8th, 2005, there are resources in the family that could keep Henry where he is for another six months . . . that is inconsistent with the status of dependency. That the father may choose not to devote the resources there or deem it unwise is not relevant under the statutory criteria.

> Similarly, upon questioning of Henry, it is also clear that the evidence is that he is not presently in a place, presently, today, September 8th, 2005, in circumstances which constitute a danger of substantial damage to his psychological or physical development.

VRP at 203-04. The next day, DSHS presented proposed findings of fact, conclusions of law, and an order dismissing the dependency petition. The trial court signed the order after making several changes. The trial court lined-out "Findings of Fact" from the heading of the order. CP at 6. The court also lined-out "The court being fully advised makes the following . . . Findings of Fact," replacing it with "Viewed pursuant to the applicable legal standard, relevant testimony and evidence is: . . . ." CP at 7.

¶24 The trial court entered the following conclusion of law:

> 2. Even when viewing all of the evidence in a light most favorable to the parents and considering it as being true, there is no basis for a rational trier of fact to conclude that Henry Schermer has no parent capable of adequately caring for him, such that he is in circumstances which constitute a danger of substantial damage to his psychological or physical development under RCW 13.34.030(5)(c). The evidence is that the father has the necessary ability and capacity and that Henry is presently safe.

CP at 11. Henry, but not his parents, appealed the court order.

¶25 Applying a de novo standard of review, the Court of Appeals viewed the evidence in the light most favorable to the plaintiffs and reversed the trial court. The Court of Appeals reasoned that Henry presented a prima facie case for dependency under RCW 13.34.030(5)(c) by presenting evidence that his parents could not adequately care for him in their home, taking into account his special needs for intensive mental health treatment, his mother's mental state, and his father's inability to be present in the home to supervise him. The court rejected the trial court's reasoning that Henry could not be found dependent so long as his parents owned a home, stating, "[c]omplete parental financial destitution is not a prerequisite to a dependency determination under RCW 13.34.030(5)(c)." *In re Dependency of H.S.*, 135 Wn. App. 223, 231, 144 P.3d 353 (2006).

¶26 The Court of Appeals observed that the statutes provide for child support for dependent children. The court also reasoned that requiring parents to sell their home would be inconsistent with public policy, as embodied in the homestead act, chapter 6.13 RCW, and WAC 388-855-0035(2) (exempting family home from assets deemed available to pay the costs of an involuntarily committed mental health patient). The Court of Appeals held that the trial court erred in ruling, as a matter of law, that Henry was not dependent and remanded the case for a full evidentiary hearing. The State petitioned for discretionary review, and we granted review. *In re Dependency of H.S.*, 159 Wn.2d 1004 (2007).

## ANALYSIS

¶27 Initially, the parties dispute the relevant standard of review. The trial court dismissed the petition on a CR 41(b)(3) motion after the parents rested. The State argues that this court should review the trial court's decision for substantial evidence only, while Henry responds that review is de novo, viewing the evidence in the light most favorable to him.

¶28 In granting a CR 41(b)(3) motion, a trial court may either weigh the evidence and make a factual determination that the plaintiff has failed to come forth with credible evidence of a prima facie case, or it may view the evidence in the light most favorable to the plaintiff and rule, as a matter of law, that the plaintiff has failed to establish a prima facie case. *N. Fiorito Co. v. State*, 69 Wn.2d 616, 618-19, 419 P.2d 586 (1966); *see also* 4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 41, at 55 (5th ed. 2006). The court must make findings of fact when it enters a judgment on the merits but need not do so when ruling that the plaintiff has failed to state a claim as a matter of law. *Id.*

¶29 If the trial court dismisses the case as a matter of law, review is de novo and the question on appeal is

whether the plaintiff presented a prima facie case, viewing the evidence in the light most favorable to the plaintiff. But if the trial court acts as a fact-finder, appellate review is limited to whether substantial evidence supports the trial court's findings and whether the findings support its conclusions of law. *Nelson Constr. Co. of Ferndale, Inc. v. Port of Bremerton*, 20 Wn. App. 321, 582 P.2d 511, *review denied*, 91 Wn.2d 1002 (1978). The entry of findings strongly suggests that the trial court weighed the evidence because no findings or conclusions are required when the court views the evidence in the light most favorable to the plaintiff and rules as a matter of law. *Id.* at 327.

¶30 There is no support in the record for the State's assertion that the trial court "weighed the evidence and credibility of witnesses and made factual findings based on that evidence." Mot. for Discretionary Review at 17. Rather, the trial court deliberately and plainly refused to weigh the evidence, ruling as a matter of law.

¶31 The State presented the court with proposed "Findings of Fact, Conclusions of Law, and Order of Dismissal on Petition for Dependency." The trial court lined-out "Findings of Fact." The trial court also rejected several proposed "findings" that tended to favor the State. The court stated as a "conclusion of law," that "[e]ven when viewing all of the evidence in a light most favorable to the parents and considering it as being true, there is no basis for a rational trier of fact to conclude that Henry" has either been abandoned or lacks a parent capable of adequately caring for him. CP at 6-11.

¶32 The trial court's deliberate refusal to weigh the evidence is also apparent in its oral ruling:

> At this stage of the proceeding, the standard is accepting the truth of the testimony proffered by the petitioners; is there evidence from which a rational trier of fact would conclude by a preponderance that the statutory[ ] requirements for a finding that Henry Schermer is a dependent child have been met.

VRP at 201-02. Because the trial court ruled as a matter of law, the appropriate standard of review is de novo, viewing the evidence in the light most favorable to the plaintiff.

¶33 Next, DSHS contends that the Court of Appeals decision is inconsistent with the principles that the dependency laws are intended to protect a child from unfit parents, that a child's mental illness or other disability is insufficient, alone, to warrant state interference in the family, that a finding of dependency may not be based solely on the family's poverty or financial insecurity, and that parents may not be deprived of custody absent proof of parental unfitness. In DSHS's view, the Court of Appeals decision allows parents to misuse the dependency process as a means to obtain state-subsidized mental health services for their children, contrary to legislative intent.

¶34 Henry responds that the Court of Appeals decision is consistent with existing statutes and case law governing dependency actions. Henry points out that the statute contemplates situations where DSHS does not agree with a dependency determination. Henry asserts that the Court of Appeals correctly recognized that he established a prima facie case of dependency in showing that he has mental health needs that, if unmet, pose a grave danger to himself and others and that neither parent is capable of meeting those needs. Henry observes that the Court of Appeals did not hold that he or his parents are entitled to anything but a full evidentiary hearing.

¶35 Parents have a fundamental liberty interest in the care and welfare of their minor children. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). However, the State has an interest in protecting the physical, mental, and emotional health of children. *In re Welfare of Becker*, 87 Wn.2d 470, 477, 553 P.2d 1339 (1976). It is well established that when a child's physical or mental health is seriously jeopardized by parental deficiencies, "the State has a parens patriae right and responsibility to intervene to protect the child." *Sumey*, 94

Wn.2d at 762 (citing *Parham v. J.R.*, 442 U.S. 584, 603, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979)). The legislature recognized these competing interests in RCW 13.34.020, in which it declared that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized."

¶36 In balancing the legal rights of parents against the rights of the child, "the rights and safety of the child . . . shall be the paramount concern." RCW 13.34.020. To that end, the legislature has provided a procedure by which a child may be declared "dependent," transferring legal custody to the State. There are three statutory bases for a finding of dependency. RCW 13.34.030(5). "Any person" may file a petition with the trial court showing that there is a dependent child and requesting that the court deal with the child as provided by the dependency statutes. RCW 13.34.040(1). Within 75 days after the petition is filed, the court must hold a fact-finding hearing to determine whether the allegations in the petition are true. RCW 13.34.070. At the hearing, the petitioner has the burden of establishing by a preponderance of the evidence that the child meets one of the statutory definitions of dependency. RCW 13.34.110(1). "[T]he goal of a dependency hearing is to determine the welfare of the child and his best interests." *Becker*, 87 Wn.2d at 476. If the court finds that the child is dependent, it then holds a hearing to determine placement of the child and the services to be provided. RCW 13.34.130.

¶37 This court has discussed the importance of retaining the relatively lenient preponderance standard in a dependency proceeding, noting that dependency has the important function of allowing state intervention in order to remedy family problems and provide needed services. "A dependency proceeding can be helpful and remedial in preserving and mending family ties because of the social services and dispositional remedies that the State can provide. Permitting state intervention on a standard of proof lower than a clear and convincing standard is important in providing the necessary flexibility to the State in its

attempts to both protect the child and preserve the family." *In re Chubb*, 46 Wn. App. 530, 536-37, 731 P.2d 537 (1987) (factual predicate for dependency need not be proved again in termination proceedings under higher standard of proof), *aff'd*, 112 Wn.2d 719, 773 P.2d 851 (1989). "The primary purpose of a dependency is to allow courts to order remedial measures to preserve and mend family ties." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005).

¶38 Under RCW 13.34.030(5), a "[d]ependent child" means any child who:

(a) Has been abandoned;

(b) Is abused or neglected . . . ; or

(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

¶39 In framing its argument, the State relies heavily on the principle that a finding of parental unfitness is necessary before the State may intervene in a parent's decisions over their children. The State asserts, "Whether the parent is abusive, neglectful, has abandoned the child or is otherwise deficient, the law requires proof of *parental* deficiencies that harm the child or create a risk of harm." Suppl. Br. of DSHS at 13. The State is correct that a dependency determination requires a showing of parental deficiency. It should be noted, however, that a finding of parental *unfitness* is not an absolute prerequisite to dependency. *In re Welfare of Key*, 119 Wn.2d 600, 836 P.2d 200 (1992). In *Key*, this court recognized that a finding of parental unfitness is constitutionally required to permanently *terminate* a parent's rights, but not to declare a child *dependent*. "A dependency proceeding and a termination proceeding have different objectives, statutory requirements, and safeguards." *Id.* at 609. As this court stated, "[t]he key difference in the dependency hearing is 'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." *Id.* (quoting *In re A.W.*, 53 Wn.

App. 22, 30, 765 P.2d 307 (1988), *review denied*, 112 Wn.2d 1017 (1989)); *see also Sumey*, 94 Wn.2d 757 (rejecting constitutional challenge to statute allowing out-of-home placement of "runaway" youth without regard to parental fault).

¶40 A dependency based on RCW 13.34.030(5)(c) does not turn on parental "unfitness" in the usual sense. Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs. Under RCW 13.34-.030(5)(c), it is unnecessary to find parental misconduct in order to find a child dependent.

¶41 For example, *In re Dependency of C.M.*, 118 Wn. App. 643, 78 P.3d 191 (2003), involved an eight year old boy with significant developmental delays whose father was unable to meet his son's special needs due to his own mental health issues. The Court of Appeals upheld a dependency order, stating: "While the evidence shows that McCracken can adequately care for C.M.'s basic needs, the trial court's finding that C.M.'s developmental needs have not been met is supported by substantial evidence, and meets . . . the definition of dependent child in RCW 13-.34.030(5)(c)." *Id.* at 654; *see also T.L.G.*, 126 Wn. App. at 186 n.2 (recognizing that "the challenges of parenting a child with special medical needs" was an appropriate factor for the trial court to consider in evaluating whether the parents could adequately care for the child under RCW 13.34.030(5)(c)).

¶42 The State asserts that a dependency finding under the circumstances presented is inconsistent with the "fundamental principle" that a parent is not unfit simply because "he or she is employed full time or because the parent lacks financial resources." Suppl. Br. of DSHS at 15. The State cites *In re Welfare of Warren*, 40 Wn.2d 342, 243 P.2d 632 (1952), for the proposition that a finding of dependency may not be based solely on the economic circumstances of the family. In *Warren*, the court observed, " 'the tendrils of parental affection entwine around the

offspring of the poor with as much strength as they do around the children of the rich' " and that so long as the father was capable of providing a suitable home, his financial resources were irrelevant. *Id.* at 345 (quoting *In re Application of Fields*, 56 Wash. 259, 266, 105 P. 466 (1909)).

¶43 The State's reliance on *Warren* is misplaced. This is not a case where the dependency is based solely on a parent's lack of financial resources. The " 'tendrils of parental affection' " have been torn asunder in this family by circumstances that have nothing to do with the family's financial means. Henry threatened to kill the family in their sleep, and he exposed himself to his younger brother. Henry's mother compared him to a "terrorist" and cannot even bear the thought of allowing him to return home. If her fears are overblown and unrealistic, as the State suggests, she is apparently suffering from a mental disorder that interferes with her ability to adequately parent Henry. A parent's mental illness may support a finding of dependency when it interferes with parenting ability. *Chubb*, 112 Wn.2d at 729; *see also T.L.G.*, 126 Wn. App. 181 (parents' mental health problems, including bipolar and severe anxiety, supported dependency finding in view of lack of attachment to children). The evidence establishes, prima facie, that Henry's mother is incapable of caring for him because of her mental health problems.

¶44 Henry's father is the sole provider for the family and is unable to be present and care for him. Again, this is unlike the situation in *Warren*, where the child's father was able to provide proper supervision for the child in the home. Moreover, Henry's father fears that Henry will harm himself and others if he returns home and that he will be unable to physically restrain him in view of his size if he does so. The evidence establishes, prima facie, that Henry's father is incapable of meeting Henry's special needs taking into account his own economic, psychological, and physical limitations.

¶45 The State's reliance on RCW 26.44.020(15) is also misplaced. That statute clarifies that poverty and home-

lessness, alone, do not constitute negligence or maltreatment of a child. It has no relevance to this case. The statute involves mandatory reporting and investigation requirements relating to child abuse and neglect. As previously observed, child abuse and neglect are not the only bases for a dependency action. A dependency action under RCW 13.34.030(5)(c) is not predicated on a finding of abuse or neglect. And while it is the policy of the State to avoid such dependencies, a child can be found dependent when the child is homeless as a result of the parent's economic circumstances. *See Wash. State Coal. for Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 949 P.2d 1291 (1997) (trial court may order housing assistance to families of children in foster care due to homelessness).

¶46 The Schermers' inability to have Henry in their home under their parental care is a result not only of their economic circumstances but also his severe mental health problems and the emotional trauma they have experienced in dealing with him, which has compromised their ability to parent him adequately.

¶47 The State further argues that a dependency finding may not be based solely on the fact that Henry suffers a mental illness. In support, the State cites RCW 26.44-.015(3) ("No parent . . . may be deemed abusive or neglectful solely by reason of the . . . child's blindness, deafness, developmental disability, or other handicap."). Again, that provision is part of the statutory scheme governing the mandatory reporting and investigation of child abuse. The statute clarifies that a child's mental illness, alone, does not trigger the mandatory reporting and investigation requirement. It does not state that mental illness is not a relevant consideration in making a finding of dependency under RCW 13.34.030(5)(c), which does not require a finding of culpability on the part of the parents.

¶48 The State cites two cases in support of the proposition that Henry's mental illness cannot justify a finding of dependency. *In re Welfare of Frank*, 41 Wn.2d 294, 248 P.2d 553 (1952); *In re Welfare of Hudson*, 13 Wn.2d 673, 126 P.2d

765 (1942). Neither case involves mental illness. Both cases involved children who were adjudicated dependent based on their parents' failure to obtain necessary medical care: treatment for a speech impediment in *Frank*, and surgery on a deformed arm in *Hudson*. This court reversed both rulings, concluding that the dependency law did not allow a finding of dependency due to a parent's failure to provide necessary medical care. *See Frank*, 41 Wn.2d at 296 (" 'The juvenile court law (REM. REV. STAT., § 1987-1 *et seq.*) does not contain any provision respecting the furnishing of necessary medical or surgical care.' " " 'The juvenile court law excludes from its provisions a requirement to furnish medical or surgical care, while in the penal section medical attendance is included.' " (quoting *Hudson*, 13 Wn.2d at 693, 705)).

¶49 Our dependency laws have evolved in the last half century, since *Frank* and *Hudson* were decided. It is now well established that a parent's inability to provide necessary medical care, including mental health care, may support a dependency finding. *See, e.g.*, *In re Welfare of Feldman*, 94 Wn.2d 244, 615 P.2d 1290 (1980) (child suffering from mental illness dependent under former RCW 13.04-.010(2) (1961) as having "no parent or guardian willing to exercise, or capable of exercising, proper parental control"); *see also* RCW 74.13.350 (governing dependencies resulting from a parent's inability to provide in-home care for developmentally disabled children).

¶50 The State also relies on *Key*, 119 Wn.2d 600, in support of its argument that a parent's inability to meet a child's special needs, alone, does not support a dependency finding. *Key* involved a severely disabled child who required full-time residential care. Her mother cared for her at home during her first three years of life but was unable to do so after her marriage dissolved; she lost her insurance coverage, and she needed to work. She entered into a voluntary foster care agreement with DSHS, but periodically took the child back into her home when she was dissatisfied with the care her daughter received. DSHS filed a dependency peti-

tion, alleging the child was dependent under former RCW 13.34.030(2)(c) and (d) (1988), *repealed by* Laws of 1979, ch. 155, § 86. Former RCW 13.34.030(2)(c) ("no parent capable") is now codified as RCW 13.34.030(5)(c), the statute at issue in this case. Former RCW 13.34.030(2)(d) allowed a finding of dependency for a child who is developmentally disabled and "whose parent, guardian or legal custodian together with the department determines that services appropriate to the child's needs can not be provided in the home." The trial court found the child dependent under former RCW 13.34.030(2)(d).

¶51 The legislature crafted the language of former RCW 13.34.030(2)(d) to avoid any suggestion of parental unfitness in order "to minimize the embarrassment and inconvenience of developmentally disabled persons and their families" caused by a dependency determination. LAWS OF 1983, ch. 311, § 1. Thus, parents of developmentally disabled children were not required to concede parental unfitness or be found unfit to care for their children in order to access needed services.

¶52 In *Key*, this court upheld the constitutionality of former RCW 13.34.030(2)(d), holding that proof of parental unfitness is not a prerequisite to an involuntary dependency.

¶53 The State is correct that in 1997, the legislature eliminated former RCW 13.34.030(2)(d) as a basis for dependency, transferring responsibility for developmentally disabled children to the Division of Developmental Disabilities.[2] LAWS OF 1997, ch. 386, § 7. The legislature provided a separate statutory scheme which allows out-of-home placement for developmentally disabled children through voluntary agreements. RCW 74.13.350. Parents retain legal cus-

---

[2] The driving force behind the amendment was not the legislature's dissatisfaction with this court's holding in *Key*, as DSHS implies (the amendment occurred five years after *Key*). Rather, the decision apparently was economic. The Senate Bill Report stated that "[a] recent management report on the DSHS suggests the cases could be handled more efficiently within the Division of Developmental Disabilities." S.B. REP. on S.B. 5710, at 2, 54th Leg., Reg. Sess. (Wash. 1997).

tody under such agreements, and any party to the agreement may terminate it at any time. *Id.*

¶54 In repealing former RCW 13.34.030(2)(d), the legislature recognized that "[a] developmentally disabled child may be found to be dependent because the parents are unable to meet the child's special needs." S.B. REP. on S.B. 5710, at 2, 54th Leg., Reg. Sess. (Wash. 1997). A finding of dependency "makes the child eligible for certain state and federally funded programs for which the child would not otherwise be eligible." *Id.* The Senate Bill Report further explained that "[o]nce a developmentally disabled child is found to be dependent because his or her parents are unable to meet their special needs, responsibility for the child is transferred to the Division of Developmental Disabilities." *Id.* at 3.

¶55 Significantly, the legislature did not make voluntary agreements the exclusive means of obtaining out-of-home placement for developmentally disabled children when it repealed former RCW 13.34.030(2)(d). "Nothing in this section shall prevent the department from filing a dependency petition if there is reason to believe that the child is a dependent child as defined in RCW 13.34.030." RCW 74.13.350. Moreover, the legislature amended the law again the following year to clarify that a *parent* could petition for dependency in the event DSHS refused to enter a voluntary agreement. FINAL H.B. REP. on H.B. 2557, at 1, 55th Leg., Reg. Sess. (Wash. 1998). RCW 74.13.350 provides:

> It is the intent of the legislature that the department undertake voluntary out-of-home placement in cases where the child's development disability is such that the parent, guardian, or legal custodian is unable to provide the necessary care for the child, and . . . has determined that the child would benefit from placement outside of the home. If the department does not accept a voluntary placement agreement signed by the parent, a petition may be filed and an action pursued under chapter 13.34 RCW. The department shall inform the parent, guardian, or legal custodian in writing of their right to civil action under chapter 13.34 RCW.

The final bill report explained that the purpose of allowing voluntary agreements is "to avoid requiring [parents] to say they are unable to care for their child." FINAL H.B. REP. on H.B. 2557, *supra*, at 1. Nevertheless, in the event the State and the parents do not agree on a voluntary placement, either the State or the parents may petition for dependency under chapter 13.34 RCW.

¶56 The Court of Appeals decision is consistent with the statutory scheme governing developmentally disabled children. Henry is not a developmentally disabled child, within the meaning of the statute, so RCW 74.13.350 does not apply to him. Nevertheless, RCW 74.13.350 makes evident that a parent's inability to meet a child's special needs in the home is an appropriate basis for a dependency petition.

¶57 The legislature contemplated that when a parent is incapable of meeting the special needs of a child in the home, and cannot come to an agreement with DSHS for out-of-home placement, that parent may petition for dependency under RCW 13.34.030(5)(c). This is evident not only under RCW 74.13.350 but also chapter 13.34 RCW. The legislature has authorized "[a]ny person" to file a dependency petition, not excluding the parents of an allegedly dependent child. RCW 13.34.040(1). DSHS points out that with regard to stipulated dependencies, the legislature has provided that DSHS "must also agree to and sign the order" if it is not the petitioner. RCW 13.34.110(2)(a). The statute does not grant DSHS veto power over a dependency finding following a contested hearing, however.

¶58 The State correctly observes that in *Key*, the court found that the child was *not* dependent under the alternative statutory basis alleged. Former RCW 13.34.030(2)(c) ("no parent capable"). However, in *Key*, the uncontroverted evidence was that the mother was a fit parent. Her daughter's severe disability "is the only reason she is in foster care." *Key*, 119 Wn.2d at 604. This court observed that "Ms. Key is not an unfit parent in any sense." *Id.* The dependency finding "had nothing to do with any finding of unfitness on Ms. Key's part." *Id.* at 605. Key loved her

daughter, adequately cared for her, so long as she was able to stay at home and do so, and vehemently opposed relinquishing custody to the State. DSHS's own social workers testified that Key would be able to care for her daughter in her own home if she were provided with sufficient services.

¶59 *Key* is factually distinguishable from the case before this court. Here, both parents testified that they are unable and, indeed, unwilling to care for Henry at home. His mother described her son as a "terrorist" and stated she could not even bear to contemplate the possibility of him returning home. The mother's therapist testified that she suffered from posttraumatic stress disorder relating to Henry's threat to kill them all in their sleep. The father testified that he would be unable to physically restrain Henry from a violent assault due to his size. This presents a very different factual situation than existed in *Key*, where the mother desperately wanted to care for her child in her own home and would be able to do so but for her need to work outside of the home.

¶60 The State asserts that Henry has failed to show that his parents' inability to care for him poses a substantial danger to his "psychological or physical development."

¶61 The Court of Appeals is correct that the trial court erred in concluding Henry could not be found dependent so long as he was safe "presently, today, September 8th, 2005," the day of the dependency hearing. A dependency finding under RCW 13.34.030(5) does not require proof of actual harm, only a "danger" of harm. "Nothing in the statute suggests that [the State] must stay its hand until actual damage to the endangered child has resulted." *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979). In evaluating the risk of harm, a trial court has much broader discretion than the court recognized in this case. For example, in *In re Dependency of Brown*, this court affirmed a dependency finding, although the parent had secured a job and housing at the time of the hearing, because the trial court determined that the parent "had yet to show he could provide a stable home that posed no

danger of substantial damage to the child's physical and psychological health." *In re Dependency of Brown*, 149 Wn.2d 836, 842, 72 P.3d 757 (2003); *see T.L.G.*, 126 Wn. App. 181 (pending eviction supports a dependency finding); *In re Interest of J.F.*, 109 Wn. App. 718, 37 P.3d 1227 (2001) (upholding dependency finding despite lack of evidence child was actually harmed when mother sent her on a long-haul truck ride with a stranger).

¶62 Viewed in the light most favorable to Henry, the evidence shows he poses a risk to himself and others unless confined to a secure residential facility and that he will be released from that facility within two weeks. Following his release, Henry either will be without a home or will live in a home with parents who cannot bear the thought of living under the same roof with him and fear that he will sexually abuse his siblings and/or kill them all in their sleep. A rational trier of fact could conclude that Henry faces a substantial risk of harm to his psychological and physical health.

¶63 Importantly, a trial court has broad discretion in evaluating all of the evidence before it when determining whether a dependency order should be entered or continued. "The complexity of the cases and the need for careful individual treatment militates against the mandatory consideration of certain specified factors in every case. Nevertheless, the courts have broad discretion and are allowed considerable flexibility to receive and evaluate all relevant evidence in reaching a decision that recognizes both the welfare of the child and parental rights." *Becker*, 87 Wn.2d at 477-78 (citations omitted).

¶64 Here, neither the Schermers' financial circumstances nor Henry's mental illness, alone, establishes a finding of dependency. However, when looking at the constellation of facts presented in this case as a whole, in the light most favorable to the petitioners, a rational person could conclude that Henry's parents are incapable of meeting his special needs and that their inability to do so poses a substantial danger to his physical and mental health.

¶65 Turning to the trial court's discussion of the Schermers' financial status, the trial court viewed as dispositive the fact that the Schermers would be able to finance six additional months of inpatient treatment for Henry if they sold their family home. Stephen testified that he was unwilling to sell the family home because it did not make sense to him, given that at the end of six months Henry would still need years of intensive treatment and the family would be left without a home. But in the trial court's view, the parents were "capable" of adequately caring for Henry, within the meaning of the statute, so long as they could pay someone else to care for him, and they could pay so long as they had any financial assets, including a home.

 ¶66 The Court of Appeals disagreed with the trial court's reasoning, stating "[c]omplete parental financial destitution is not a prerequisite to a dependency determination under RCW 13.34.030(5)(c)." *H.S.*, 135 Wn. App. at 231. The court reasoned that requiring the Schermers to sell their family home before their child may be declared dependent is inconsistent with public policy as embodied in the homestead act, chapter 6.13 RCW, and WAC 388-855-0035(2) (exempting value of the family home in calculating a patient's financial obligation for mental health services provided by the State).

¶67 The homestead act "implements the policy that each citizen have a home 'where [the] family may be sheltered and live beyond the reach of financial misfortune.'" *Pinebrook Homeowners Ass'n v. Owen*, 48 Wn. App. 424, 427, 739 P.2d 110 (quoting *City of Algona v. Sharp*, 30 Wn. App. 837, 841, 638 P.2d 627 (1982)), *review denied*, 109 Wn.2d 1009 (1987). The act is favored in law, and courts construe it liberally so it may achieve its purpose of protecting family homes. *Id.* A home automatically becomes a homestead when the owners use the property as their primary residence. RCW 6.13.040; *In re Trustee's Sale of Real Prop. of Sweet*, 88 Wn. App. 199, 201, 944 P.2d 414 (1997). The homestead act protects $40,000 in value. RCW 6.13.030.

¶68 The State points out that the homestead act does not apply to child support obligations. RCW 6.13.080(4). But that is not inconsistent with the Court of Appeals reasoning. The exception is aimed at scofflaw parents who evade court-ordered child support obligations. A court-ordered child support obligation is subject to specific statutory standards intended to reasonably relate a parent's child support obligation to the parent's income and ability to pay.

¶69 Regardless of whether it is against public policy to expect parents to sell their home to finance a child's medical expenses before state intervention is justified, the Court of Appeals is correct insofar as the parent's ability to pay is an issue that becomes relevant after a finding of dependency. In zeroing in on the family's remaining financial assets, the trial court's vision strayed from what should have been the central focus of the dependency hearing: Henry's welfare. Whether the parents could or should sell their family home is a question that may be resolved in the context of determining their financial obligations after the adjudication of dependency. The fact is that at the time of the dependency hearing, viewing the evidence in the light most favorable to Henry, his parents had not sold their family home and were unwilling to do so, Henry was about to be released from a residential treatment facility, and his parents were unable to keep him safe in their home.

¶70 The State suggests that if the Court of Appeals decision is allowed to stand, parents may file dependency petitions "simply because a parent needs to work full time or needs assistance to care for a child with special needs." Mot. for Discretionary Review at 12. The State contends this result would be inconsistent with legislative intent that parents may not relinquish custody of their child as a means of avoiding responsibility, as embodied in our adoption statute, RCW 26.33.010.[3]

---

[3] In relevant part, RCW 26.33.010 provides: "It is the intent of the legislature that this chapter be used only as a means for placing children in adoptive homes and not *as a means for parents to avoid responsibility for their children* unless the

¶71 The State's reliance on the legislative intent expressed in RCW 26.33.010 is misplaced. Relinquishment under the adoption statute relieves parents of all financial and legal responsibility for their child. *See* RCW 26.33-.130(2) ("An order terminating the parent-child relationship divests the parent and the child of all legal rights, powers, privileges, immunities, duties, and obligations with respect to each other."). Although a finding of dependency transfers *legal* custody of a child to the State, it does not absolve a parent of *financial* responsibility for a child. *See* RCW 13.34.160 (authorizing dependency court to enter child support order); RCW 74.13.350 ("[n]othing in this section prohibits the department from seeking support from parents of a child, including a child with a developmental disability if the child has been placed into care as a result of an action under chapter 13.34 RCW").

¶72 The State also contends that the Court of Appeals decision paves the way for parents to use the dependency process as a "form of insurance" when faced with financial hardship caused by a child's medical needs. The State asserts that this is contrary to case law and statutes that hold the dependency statutes do not create privately enforceable rights to services.

¶73 In support, the State relies on *In re Welfare of J.H.*, 75 Wn. App. 887, 880 P.2d 1030 (1994). *J.H.* involved a dependent child who was allowed to remain in the custody of her mother. The mother and child lived together at a shelter but faced imminent eviction. At a disposition hearing, the trial court ordered DSHS to provide a cash stipend of up to $1,200 to cover private housing expenses in the event the mother could not obtain public housing. The Court of Appeals vacated the order. The Court of Appeals agreed with the State that in ordering the cash stipend, the trial court inappropriately intruded on the legislature's prerogative to make budget appropriations. *Id.* at 894-95. The court reasoned that DSHS's general duty to " 'protect[ ]

department, an agency, or a prospective adoptive parent is willing to assume the responsibility for the child."

and car[e] for homeless, dependent, or neglected children' "
is a policy statute that does not create an enforceable right.
*Id*. at 891 (quoting former RCW 74.13.020(2) (1979)). The
court noted that the legislature was unequivocal in denying
a court authority to order DSHS to provide specific services:

> "Nothing in this chapter shall be construed to create an
> entitlement to services nor to create judicial authority to order
> the provision of family preservation services to any person or
> family where the department has determined that such ser-
> vices are unavailable or unsuitable or that the child or family
> are not eligible for such services."

*Id*. at 892 (quoting former RCW 74.14C.005(3) (1992)); *see
also In re Placement of R.J.*, 102 Wn. App. 128, 5 P.3d 1284
(2000) (trial court lacked authority to order DSHS to make
a specific placement where statute expressly required
DSHS's voluntary agreement).

¶74 The State's reliance on *J.H.* is inappropriate given
the procedural posture of this case. DSHS has not been
ordered to do anything. Allowing the dependency petition to
proceed to a full evidentiary hearing is not tantamount to
recognizing an entitlement to "subsidized mental health
services," as the State contends. Suppl. Br. of DSHS at 21.
In contrast, dismissing the petition because DSHS does not
believe that Henry's situation is severe enough to warrant
state aid would interfere with the judicial function of
making a dependency determination. In filing the petition,
the Schermers have properly invoked the court's authority
to determine whether their son falls within the statutory
definition of "dependent child." On remand, DSHS may
present evidence and arguments to rebut the Schermers'
evidence.

¶75 The State points out that relinquishing parental
custody in order to obtain mental health services for chil-
dren is a problem that has preoccupied government officials
and family advocates nationwide and is the focus of much
critical commentary. A recent General Accounting Office
(GAO) survey found that at least 12,700 children in 19

states were placed in foster care solely to obtain mental health services. U.S. GAO, REPORT TO CONGRESSIONAL REQUESTERS, CHILD WELFARE AND JUVENILE JUSTICE: FEDERAL AGENCIES COULD PLAY A STRONGER ROLE IN HELPING STATES REDUCE THE NUMBER OF CHILDREN PLACED SOLELY TO OBTAIN MENTAL HEALTH SERVICES (GAO-03-397, Apr. 21, 2003).[4] There appears to be an emerging national consensus that *forcing* parents "to trade custody for care" is bad public policy. Elizabeth A. Varney, *Trading Custody for Care: Why Parents Are Forced to Choose Between the Two and Why the Government Must Support the Keeping Families Together Act*, 39 NEW ENG. L. REV. 755, 756 (2005); Adria N. Bullock, *The Sacrifice Wrought By a Costly and Fragmented Mental Health Care System: Parents Forced to Relinquish Custody to Obtain Care for Their Children*, 24 DEV. MENTAL HEALTH L. 17 (2005). Foster care systems are often ill-equipped to meet the mental health needs of children and may result in greater harm than good. Thus, efforts are underway at the national level to provide block grants to states to provide greater access to mental health services for minors outside of the foster care system. *See* Keeping Families Together Act, H.R. 823, 109th Cong. § 2 (2005). There is no serious question, however, that a parent's inability to adequately care for a child due to the child's severe mental illness is an appropriate ground for a dependency finding. The question is whether adequate alternatives to dependency should be made available to families.

¶76 Certainly, it is the policy of this state to avoid dependencies resulting from a child's unmet mental health care needs. Our legislature has declared that "the goal of serving emotionally disturbed and mentally ill children, potentially dependent children, and families-in-conflict in their own homes to avoid out-of-home placement of the child, when that form of care is premature, unnecessary, or inappropriate, is a high priority of this state." RCW 74.14A-

---

[4] *See* U.S. Government Accountability Office, *available at* http://www.gao.gov/new.items/d03397.pdf (last visited Sept. 27, 2007).

.010. Accordingly, the legislature directed DSHS to develop social services which "[s]erve children and families in their own homes thus preventing unnecessary out-of-home placement or institutionalization." RCW 74.14A.020(8)(a)(iii). And in 1995, the legislature enacted the family preservation services act, chapter 74.14C RCW, with the intention of reducing the number of dependent children by providing early intervention and more intensive services for families at risk. "The legislature intends services be locally based and offered as early as possible to avoid disruption to the family, out-of-home placement of the child, and entry into the dependency system." RCW 74.14C.005(1). Family preservation services include respite care and the promotion of parenting skills with respect to "child development, family budgeting, coping with stress, health, safety, and nutrition." RCW 74.14C.010(3)(b).

¶77 Relying on the policy preference for dealing with mentally ill children outside of the dependency context, the State argues the Schermers should have accessed alternative services in lieu of dependency. The State disputes the Court of Appeals' characterization of Henry's situation as "a train headed toward the end of the track," contending that the record does not support this conclusion because the Schermers failed to pursue other options. The State points to the Children's Long Term Inpatient Program (CLIP) as an alternative. Suppl. Br. of DSHS at 17. According to the Schermers, they met with CLIP officials to discuss the possibility of placing Henry in the program but were told he was not currently displaying severe enough symptoms to warrant admission. Br. of Resp't, App. A (Pet'r's Report to Ct.) at 5.

¶78 Because the trial court dismissed this case as a matter of law based on the court's erroneous conclusion that Henry was not a dependent child because on the day of the hearing he was being adequately cared for out of the home, this case must be remanded for a new hearing. On remand, the State will be free to present evidence to demonstrate that adequate alternatives to dependency exist and/or that

Henry's condition is not as severe as he and his parents claim. At this point, the record shows that DSHS offered only a door alarm and respite care, which Henry's parents and treatment providers deemed clearly inadequate to make it safe for him to return home.

¶79 There is no question that parents bear the primary responsibility for the support of their children. *Feldman*, 94 Wn.2d at 250 (citing *State v. Wood*, 89 Wn.2d 97, 569 P.2d 1148 (1977)). Once a child is declared dependent, "the court may inquire into the ability of the parent or parents of the child to pay child support and may enter an order of child support." RCW 13.34.160(1). If the court fails to act, DSHS "may establish an administrative order for support." RCW 13.34.160(3). Washington has a strong public policy to recover the costs of services DSHS provides to the extent possible. DSHS is authorized to charge fees for services, either for "the full cost of the service provided if practical" or "on an ability-to-pay basis if practical." RCW 43.20B.020. "Whenever [DSHS] is authorized by law to collect total or partial reimbursement for the cost of its providing care of or exercising custody over any person, the department shall collect the reimbursement to the extent practical." *Id.*; *see, e.g.*, *Griffin v. Dep't of Soc. & Health Servs.*, 91 Wn.2d 616, 590 P.2d 816 (1979) (affirming DSHS bill to parents of handicapped child); *Musselman v. Dep't of Soc. & Health Servs.*, 132 Wn. App. 841, 134 P.3d 248 (2006) (affirming DSHS bill to involuntarily committed mental health patient).

¶80 In particular, a parent remains financially responsible for a dependent child's medical expenses. Because parents bear primary responsibility for the support of their children, our laws require that they bear the financial burden to the extent of their ability to pay. *Feldman*, 94 Wn.2d at 250-51. Thus, in the event Henry is found dependent, DSHS may hold Henry's parents financially liable for

the cost of foster care and any other medical services provided, including mental health services.

¶81 We affirm the Court of Appeals.

ALEXANDER, C.J., and C. JOHNSON, SANDERS, BRIDGE, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.