

2015 MAR 16 AM 9:2

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 72144-5-I |
| | ) | |
| S.T., | ) | |
| Minor Child. | ) | |
| | ) | |
| | ) | |
| DEPARTMENT OF SOCIAL & HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| DIVINA TANGALAN, | ) | |
| | ) | FILED: March 16, 2015 |
| Appellant. | ) | |

VERELLEN, J. — Divina Tangalan appeals the order finding her son dependent on two statutory grounds. Substantial evidence supports the juvenile court's finding of dependency on both grounds. While Tangalan alleges a due process violation because the State failed to assert in the dependency petition that her son was dependent because of neglect, Tangalan was neither surprised nor disadvantaged by the State's allegation. Tangalan had notice of the specific factual allegations and was prepared to defend against a finding of dependency on both grounds. We affirm the order of dependency.

FACTS

Divina Tangalan is the mother of S.T., born on March 25, 2004. Tangalan was 17 years old at the time of S.T.'s birth. When her son was born, Tangalan did not feel prepared to care for a child on her own. For substantial periods of time during the first several years of S.T.'s life, Tangalan was incarcerated on various drug charges. Since his birth, S.T. has primarily lived with Tangalan's mother, and Tangalan believed this to be in his best interests.

In 2013, Tangalan decided that S.T. should live with her, in part, because her mother was resisting her efforts to be involved in S.T.'s life. On S.T.'s ninth birthday in March 2013, Tangalan and her boyfriend, Jaree Cunningham, arrived at S.T.'s school and removed him from Tangalan's mother's home.[1] S.T. missed the birthday celebration his grandmother had planned for him after school and also did not receive the bicycle she intended to give him as a present. Tangalan arrived to take S.T. without notice to him or to his grandmother. S.T. cried when Tangalan and Cunningham took him. Tangalan demanded that he stop because she would bring him back. But Tangalan did not return S.T. Instead, she and Cunningham took him to a hotel. A few days later, Tangalan withdrew S.T. from the school he had been attending for the previous year and a half.

In the several months that followed, Tangalan moved with S.T. to various hotels. S.T. did not attend school for more than a month and was not allowed to contact his grandmother. He was sometimes left for days or weeks at Tangalan's stepfather's

---

[1] Cunningham testified that he legally changed his first name from Francois to Jaree.

house and was often left alone at hotels for periods of several hours. In June, S.T. was in a hotel with Tangalan when she attempted to commit suicide by tying a shoelace around her neck. Tangalan was taken away by an ambulance after police responded to the incident, and S.T. was left in Cunningham's care.

In June 2013, the State, through the Department of Social and Health Services, filed a dependency petition.[2] The court also signed an order authorizing the Department to take S.T. into State custody.

Shortly after the State filed the petition, Tangalan called the Department's social worker. The social worker informed Tangalan of the dependency petition, the basis for the petition, and the custody order. Tangalan said she would not relinquish custody of S.T. She told the social worker that she would have to "come down to Mississippi" to find her and S.T.[3]

Police eventually located S.T. more than three months later, on September 24, 2013. The Department initially placed S.T. in foster care, but after approximately two months, placed him in his grandmother's home. Tangalan pleaded guilty to custodial interference in the first degree in November 2013. As a result of that case, the court entered a no-contact order prohibiting contact between Tangalan and S.T.

Tangalan was incarcerated in Washington and Oregon for most of the approximately six-month period from the time the Department took S.T. into custody until the April 2014 dependency fact-finding hearing. Tangalan was scheduled to be

---

[2] S.T.'s father signed an agreed order of dependency on August 9, 2013, and is not a party to this appeal.

[3] Report of Proceedings (RP) (Apr. 22, 2014) at 114.

3

sentenced pursuant to her guilty plea to Oregon drug trafficking charges after the dependency trial. As a part of her plea in the Oregon criminal matter, Tangalan was to enroll in drug treatment in Seattle while awaiting sentencing. Tangalan did so, but then left the program because she got into an argument with a member of staff. Tangalan did not provide the Department with verification of her participation in urinalysis drug testing or with any test results. At the hearing, Tangalan denied any current drug problems, but admitted that she uses marijuana regularly "for medical reasons," claiming she never smokes in S.T.'s presence.[4] S.T.'s father said he and Tangalan used marijuana and methamphetamine together in the past.

Tangalan testified that her previous inability to care for S.T. was due to her "problems with the law" and because her mother repeatedly kicked her out of the home.[5] Tangalan said she took S.T. from her mother's home in 2013 because her mother was not allowing her to see S.T. and was not providing a healthy living environment. Tangalan also explained that she withdrew S.T. from his school because she was not allowed to be on the school premises and because she was not willing to drop him off 500 feet away from the school. Tangalan said S.T. stayed at her stepfather's house for only one week in 2013 while she moved to a better hotel. She claimed her mother "kidnapped" S.T. from her stepfather's house and so she sent Cunningham with law enforcement to her mother's house with a notarized letter giving Cunningham custody of S.T. At the hearing, Tangalan testified that she knew that S.T. was currently in third grade but she was unaware of what school he was currently

---

[4] RP (Apr. 21, 2014) at 44.

[5] Id. at 43.

4

attending. According to the court appointed special advocate (CASA) and Tangalan's mother, S.T. was actually in fourth grade.

With regard to Cunningham, Tangalan said they were no longer in a romantic relationship, although she loved him and they were still friends. She said Cunningham was still legally married and cared for seven of his own children. She said she recently found out through the dependency case that Cunningham "has a past" that included manslaughter convictions, but that she did not "really want to go into his case or know about his past life because that's his past."[6] Tangalan said S.T. was never left unsupervised with Cunningham. She also denied leaving S.T. alone in hotels, except briefly to smoke marijuana or make telephone calls. Tangalan admitted that she was very upset following a heated argument with Cunningham in June 2013, but said she was only "being melodramatic," denied any suicide attempt, and said S.T. was in another room and was not watching.[7] Tangalan testified that she did not understand why the Department was involved with her family.

Tangalan's mother testified that when S.T. was approximately 1.5 months old, Tangalan left the home, saying that all she wanted was "her things and visitation rights."[8] Tangalan's mother said there were two other instances, prior to 2013, when Tangalan took S.T. to live with her, but on both occasions, Tangalan returned S.T. to her care after a short time. Tangalan's mother further testified that S.T. had lived with her for approximately 9.5 of his 10 years.

---

[6] Id. at 69.

[7] Id. at 132.

[8] Id. at 172.

The CASA testified and recommended that S.T. be declared dependent as to Tangalan. The CASA said Tangalan had exposed S.T. to a significant amount of trauma and neglect during the period that she took him out of school and out of his grandmother's home. The CASA said it was clear that Tangalan failed to understand the "global aspect of parenting" and lacked empathy for S.T.[9] The CASA said that Tangalan failed to recognize that any of her actions were harmful to S.T. and she seemed more concerned about the "injustice done to her" and "winning the argument with grandma," than her son's well-being.[10] The CASA expressed concern about Tangalan's mental health issues.

The social worker for the Department testified that the Department was seeking an order of dependency primarily based on S.T.'s need for stability and consistency, which Tangalan had been unable to provide due to instability in her housing and relationships, her need for substance abuse and mental health services, and her criminal matters. The social worker expressed the opinion that Tangalan was not currently capable of parenting S.T., citing various factors including her lack of history of being his primary caretaker, lack of parenting skills to meet his developmental needs, and need for drug and alcohol treatment.

At the conclusion of the fact-finding hearing, the trial court found S.T. dependent under RCW 13.34.030(b) and (c). The court found that for the better part of S.T.'s life, Tangalan's mother was the primary caretaker because Tangalan had been either incarcerated, or unable, or unwilling to provide a stable home. The court found that

---

[9] RP (Apr. 22, 2014) at 56.

[10] Id. at 87.

Tangalan removed S.T. from her mother's home and his school without regard for his need for structure and stability. The court also determined that Tangalan exposed S.T. to trauma during the period she took him from her mother's home and exposed him to risk by leaving him in Cunningham's care. And finally, the court determined that Tangalan has unaddressed drug and mental health issues. Tangalan appeals the order of dependency.

ANALYSIS

Parents have a fundamental liberty interest in the care and welfare of their children, and State interference is never to be taken lightly.[11] The State has a corresponding interest in protecting the physical, mental, and emotional health of children.[12] Unlike a parental termination proceeding, a dependency hearing is "'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights."[13] The primary purpose of a dependency hearing "is to allow courts to order remedial measures to preserve and mend family ties."[14] As the legislature has determined, in balancing the legal rights of parents against the rights of the child, the rights and safety of the child is the paramount concern.[15]

To declare a child dependent, a court must find by a preponderance of the evidence that the child meets at least one of the statutory definitions of dependency

---

[11] In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007).

[12] Id.

[13] In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (quoting In re Dependency of A.W., 53 Wn. App. 22, 30, 765 P.2d 307 (1988)).

[14] In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005).

[15] RCW 13.34.020; Schermer, 161 Wn.2d at 942.

under RCW 13.34.030.[16] RCW 13.34.030(6) provides that a dependent child is any child who:

(a) Has been abandoned;

(b) Is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child; [or]

(c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

In this case, the trial court found S.T. dependent under RCW 13.34.030(6)(b) and (c). Tangalan claims there was insufficient evidence to establish that S.T. was dependent under either ground. We disagree.[17]

We will affirm an order of dependency so long as substantial evidence supports the trial court's findings of fact and the findings support the conclusions of law.[18] Evidence is substantial if, when viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence.[19] In making this determination, this court does not weigh the evidence or the credibility of witnesses.[20] Unchallenged findings are verities on appeal.[21]

---

[16] Key, 119 Wn.2d at 612.

[17] Because a court may declare a child dependent under any one of the three statutory definitions, the arguments Tangalan raises with respect to RCW 13.34.030(6)(b) arguably do not affect S.T.'s dependency status. Nevertheless, because, as Tangalan points out, a neglect or abuse finding under RCW 13.34.030(6)(b) has other, primarily employment-related collateral consequences, we address Tangalan's claims related to the finding of dependency on both statutory bases.

[18] In re Dependency of M.S.D., 144 Wn. App 468, 478, 182 P.3d 978 (2008).

[19] Id.

[20] In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

For purposes of RCW 13.34.030(6)(b), "abuse or neglect" includes the negligent treatment or maltreatment of a child.[22] Such treatment is defined as "an act or failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety."[23] Here, the State alleged and the court found neglect, but not abuse. Tangalan challenges the juvenile court's finding that Tangalan "engaged in a pattern of conduct that evidences a serious disregard of consequences to [S.T.] of such magnitude as to constitute a clear and present danger to [S.T.'s] health, welfare, and safety.[24]

Tangalan argues that, as in In re Dependency of M.S.D.,[25] the court based a finding of neglect on Tangalan's relationship with Cunnningham and her failure to protect S.T. from Cunningham. Tangalan also claims that, as in M.S.D., there was no evidence that Cunningham posed a clear and present danger to S.T. based on his prior manslaughter convictions and that the court's neglect finding merely reflects disapproval of Tangalan's choice of a partner.

However, the key findings that support the court's determination of neglect are unrelated to Tangalan's relationship with Cunningham and unchallenged on appeal. For instance, the court found that "[f]or a better part of [S.T.'s] life, he has been raised in

---

[21] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

[22] RCW 26.44.020(1).

[23] RCW 26.44 .020(16).

[24] Clerk's Papers (CP) at 690.

[25] 144 Wn. App. 468, 182 P.3d 978 (2008).

the care of his maternal grandmother."[26] The court also made written and oral findings that for a significant part of S.T.'s childhood, Tangalan was incarcerated, and that when she was not incarcerated, she was either unable or unwilling to provide a home for him. The court also found that Tangalan removed S.T. from her mother's home on more than one occasion and from the school that he had consistently attended "evidently without regard for his ongoing need for stability and structure in his life."[27] The court further determined when S.T. was in Tangalan's care, she subjected him to trauma, which caused S.T. to exhibit stress behaviors and to require trauma therapy.

While it is true that a parent's choice to have a relationship with an individual who has a criminal history is, in itself, insufficient to support a finding of dependency, the court's concern about the risk posed by Cunningham because of his prior convictions was not the determinative factor in this case.[28] Unlike the circumstances in M.S.D., where the mother apprised herself of the nature of her partner's crime in order to evaluate the risk to her child, the court determined that Tangalan demonstrated a disregard of risks and consequences to S.T. by deliberately choosing not to inform herself about Cunningham's crimes. Substantial evidence supports the court's unchallenged finding that Tangalan believed that Cunningham's past was unimportant and that it was "unnecessary to know the facts behind Mr. Cunningham's convictions."[29] And also unlike M.S.D., despite Tangalan's denial, there was substantial evidence that

---

[26] CP at 688.

[27] RP (May 6, 2014) at 175.

[28] M.S.D., 144 Wn. App. at 482.

[29] CP at 689.

she frequently left S.T. in Cunningham's care. Substantial evidence supports the determination of dependency under RCW 13.34.030(6)(b).

Tangalan also challenges the court's finding that S.T. has "no parent capable of adequately caring for him at this time."[30] In determining whether a parent is capable of parenting under RCW 13.34.030(6)(c), the State need not prove that a parent is unfit.[31] There are no specific factors a court must consider; rather, the inquiry is highly fact-specific.[32]

In arguing that the evidence demonstrated her ability to care for S.T., Tangalan relies on the testimony of her "supporters" and on her own interpretation of the conflicting evidence.[33] She ignores the contrary testimony of the State's witnesses. But even Tangalan's own testimony does not establish a "trajectory of improvement" or resolution of all her prior issues.[34]

At the time of the April 2014 fact-finding hearing, there was a five-year no-contact order in place prohibiting all contact between Tangalan and S.T. Her criminal matters were not resolved, as Tangalan was still awaiting sentencing on Oregon drug charges. Tangalan had terminated court-ordered drug treatment without completing the program. She had not verified her participation in urinalysis testing, much less established that she was drug free. Tangalan testified that she was living with a friend, but she had only lived there for a couple of months and was not named on the lease. The court found

---

[30] CP at 690.

[31] Schermer, 161 Wn.2d at 944.

[32] Id. at 951-52.

[33] Appellant's Br. at 25.

[34] Id.

that despite a previous mental health issue, Tangalan was not currently engaged in any treatment. The court also found that Tangalan had "angry outbursts" during the proceedings and demonstrated "little control over her temperament."[35] And significantly, Tangalan had not been the primary caretaker of S.T. for the majority of his life. This "constellation of facts" supports the juvenile court's determination that S.T. was dependent under subsection (c).[36]

For the first time on appeal, Tangalan alleges a violation of her right to due process because the dependency petition asserted only that S.T. met the definition of dependent under RCW 13.34.030(6)(c). She relies on our decision in In re Dependency of A.M.M.[37]

Tangalan did not object or move to continue the proceedings when it became apparent that the State alleged that S.T. was dependent under two statutory bases. But even if Tangalan can raise the issue for the first time on appeal, the circumstances here differ significantly from those present in A.M.M. and do not lend themselves to the same result.[38]

In A.M.M., the trial court terminated the mother's rights, in part, based on a parental deficiency not identified in the dependency or termination petition.[39] In that

---

[35] CP at 689.

[36] See Schermer, 161 Wn. 2d at 952.

[37] 182 Wn. App. 776, 332 P.3d 500 (2014).

[38] See RAP 2.5 (claim of error must be raised at trial in order to be addressed on appeal unless it involves a manifest error affecting a constitutional right); see also A.M.M., 182 Wn. App. at 790 n.8 (claim of due process right to adequate notice in termination proceeding may be raised for the first time on appeal).

[39] A.M.M., 182 Wn. App. at 791-92.

case, the mother became aware of an identified parental deficiency that could support termination when a social worker testified at the termination trial that the mother lacked an understanding of her children's needs.[40] This court reversed the order terminating the mother's parental rights and remanded for the trial court to strike the finding that the mother's parental deficiencies included a lack of knowledge about her children's developmental needs.[41] While there were extensive findings about the mother's substance abuse, the court did not indicate that the mother's substance abuse alone was sufficient to warrant termination.[42] Therefore, in reversing, we instructed the trial court to consider whether "termination is appropriate on the basis of the parental deficiencies of which [the mother] was given adequate notice."[43]

In this case, the neglect allegation was premised on facts stated in the dependency petition.[44] At least two of the CASA reports filed before trial referred to the Department's intervention on the basis of neglect, and the Department's trial brief alleged that S.T. met the definition of dependency under both subsections (b) and (c). In its opening statement, the State made it clear that it was seeking dependency because S.T. had been neglected and Tangalan was presently unable to adequately care for him. Tangalan's attorney expressly argued in response that the evidence did not support a finding of neglect. Tangalan presented witnesses to counter the State's

---

[40] Id. at 784.

[41] Id. at 792.

[42] Id.

[43] Id. at 793.

[44] The dependency petition was amended several times to correct spelling errors and to include facts that occurred after the June 2013 petition was filed.

allegations of neglect and inability to care for S.T. Thus, she defended against a determination of dependency under both subsections.

In the context of proceedings that result in the termination of the parent-child relationship, our court has held that constitutional due process requires that a parent receive notice of the "specific issues to be considered."[45] Notice that the hearing may result in termination is required to prevent "'surprise, helplessness and disadvantage.'"[46] "'[D]efinite allegations of the purpose of the hearing are necessary.'"[47]

Even assuming the requirements of due process are the same in the context of a dependency determination that does not sever the parental relationship, Tangalan received adequate notice of the issues to be considered.[48] The record amply demonstrates that she was not surprised, disadvantaged, or prejudiced in any manner because the dependency petition omitted the allegation that S.T. was dependent under the definition set forth in RCW 13.34.030(6)(b).

Finally, Tangalan requests remand for the correction of errors in findings of fact "e" and "p." We grant the request and remand to correct finding of fact "e" to conform to the testimony of the Department's social worker that she did not inform Tangalan of the

---

[45] A.M.M., 182 Wn. App. at 791.

[46] Id. (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)).

[47] Id.

[48] In In re Matter of A.W., 53 Wn. App. 22, 27 n.2 & 28, 765 P.2d 307 (1988), this court declined to decide whether the father received adequate notice of the initial dependency proceeding after his rights were subsequently terminated or "what, if any, due process considerations" apply at the initial dependency stage in light of the fact that the determination does not sever the relationship, the determination is reversible, judicially reviewed at set intervals, and does not prejudice or control the ultimate termination.

date of the shelter care hearing on June 7, 2013. The court should also correct finding "p" to reflect the correct date of June 4, 2013.

We remand for correction of two findings of fact, and otherwise affirm the order of dependency.

WE CONCUR: