# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of M.L.-L., | ) ) ) | No. 73145-9-I |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) | DIVISION ONE<br><br>UNPUBLISHED OPINION |
| Respondent, | ) ) ) | |
| v. | ) ) | |
| MAKEBA LICORISH, | ) ) | |
| Appellant. | ) ) ) | FILED: January 25, 2016 |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2016 JAN 25 AM 9: 22

APPELWICK — Licorish appeals a trial court order finding her son dependent. Licorish contends that the juvenile court abused its discretion by admitting evidence of her criminal history. She also challenges the testimony of one of the medical experts, claiming that the court was not entitled to rely on the expert's opinion and the evidence does not support the court's factual finding summarizing the expert's testimony. Finally, Licorish claims that a preponderance of the evidence does not support the court's finding of dependency. We affirm.

FACTS

Makeba Licorish and Devon LaFantasie are the parents of M.L.-L., a son born on May 31, 2013. In April 2014, when M.L.-L was approximately 10 months old, the Department of Health and Human Services (the Department) took him into protective custody and filed a dependency petition. A fact-finding hearing took place over the course of five days in January and February of 2015.

According to the testimony at the fact-finding hearing, Dr. Jinna Kim was M.L.-L's primary care physician between June 2013 and March 2014. During that period, Dr. Kim saw M.L.-L on seven to eight occasions. Over the course of these visits, Dr. Kim developed concerns about possible abuse. In December 2013, M.L.-L had a small bruise on his cheek and Licorish told Dr. Kim that M.L.-L. recently had bruising between his eyes that was no longer visible. A few months later, in March 2014, M.L.-L. had a bruise on his forehead and other marks on his upper back. Licorish said she did not know how the bruising occurred, but admitted she was concerned about whether her partner, LaFantasie, had inflicted the injuries. Dr. Kim recommended that Licorish take M.L.-L. to Seattle Children's Hospital for a skeletal survey. The skeletal survey did not reveal any prior skeletal injuries. Nevertheless, based on the bruising, both Dr. Kim and a social worker at the hospital made referrals to Child Protective Services (CPS).

While the CPS investigation into these referrals was ongoing, M.L.-L. sustained another injury. On April 2, a public health nurse observed M.L.-L. and reported to the assigned social worker and to CPS that he had a "goose egg" injury on his forehead.[1]

---

[1] In addition to the bruising, the public health nurse raised concerns including a fight reported by the mother, sleep safety issues, and the mother's marijuana use.

Licorish reported that, according to LaFantasie, while he was in the car with M.L.-L., the baby, who was sitting on the back seat, fell forward and hit his head on a cup holder. The public health nurse recommended that Licorish take M.L.-L. to the doctor and helped Licorish draw a diagram of the injury to document its appearance so the doctor would know whether the swelling had increased or decreased. The next day, the social worker spoke to Licorish and asked her to take M.L.-L. to the hospital for an examination. Although Licorish had agreed to do so, she did not take him because she had many other things to do that day and she did not feel that it was an "emergency situation." After learning that M.L.-L. had not been examined at the hospital, the social worker asked the police to perform a welfare check, but the police were unable to locate the family.

On the following day, April 4, Licorish took M.L.-L. to the social worker's office. The baby still had a "large bump" on his forehead and bruising on his face. The social worker called law enforcement who took M.L.-L. into protective custody and the social worker took him to the hospital.

At the hospital, pediatrician Douglas Diekema examined M.L.-L. He noted that in addition to the swollen bruise on the baby's forehead, M.L.-L. had marks that appeared to be bruises on his cheek and on the back of his neck. Dr. Diekema concluded that M.L.-L.'s forehead injury was not consistent with the reported account of how the injury occurred. Dr. Diekema said that for the type of accident described, he would not expect to see any mark 18 to 24 hours later, and he said that a child who is not yet ambulatory would have to fall from a significant height to sustain the type of injury M.L.-L. had. Based on (1) the reports of prior bruising, (2) the inconsistency between the appearance

3

of M.L.-L.'s forehead injury and the explanation of the accident, and (3) the two other marks, especially the mark on the back of M.L.-L.'s neck, which is not a site where a baby is likely to sustain bruising, Dr. Diekema expressed concern that the injuries were caused by nonaccidental trauma.

Another pediatrician with a specialty in child protection, Dr. James Metz, examined medical records and photographs taken of M.L.-L. during the April 4, 2014 examination by Dr. Diekema. According to Dr. Metz, the photographs showed bruising covering a large percentage of the forehead, and discrete bruises on the left cheek, upper and lower back. Dr. Metz concluded that the photographs showed "several marks on the child [that] were not consistent with the story given by the parents." He opined that the "constellation of previous injuries and these current injuries were very concerning or highly concerning for abuse." Dr. Metz explained that falling on a cup holder would not cause a "confluent bruise," but only a bruise at the point of contact. Dr. Metz also said that bruising on the back is unusual and that the pattern of bruising on M.L.-L.'s upper back was consistent with "grip marks."

After M.L.-L. was taken into protective custody, the court initially placed him with Licorish on the conditions that she live at her parents' residence and that LaFantasie have no contact with M.L.-L. unless such contact was supervised by someone other than Licorish. A few weeks later, the public health nurse observed the mother, father, and M.L.-L. in a car with no one else present. The court then placed M.L.-L. in the home of the maternal grandparents and did not allow the mother to live there.

The Guardian Ad Litem (GAL) assigned to the case investigated and recommended dependency. The GAL's primary concern was the April 2014 injury and

the fact that two medical experts agreed that the explanation of how the injury occurred was not plausible. The GAL believed that the parents' "minimization" of the injury and refusal to take the child to the doctor when urged to do so, reflected that ego and stubbornness were preventing them from making decisions in the best interest of the child. The GAL also had concerns about the current mental health status of the parents and about the dynamics of the relationship and potential domestic violence. The GAL noted that the father presented as dominating and discouraged the mother from cooperating with CPS. The GAL feared that in the absence of a dependency, the parents would isolate the child because they felt betrayed by the system and that the absence of court monitoring would present a risk to M.L.-L's safety.

At the conclusion of the fact finding hearing, the court found M.L.-L. dependent as to both parents. Licorish appeals. LaFantasie is not a party to this proceeding.

## DISCUSSION

Licorish claims that the juvenile court improperly considered evidence of her criminal history under ER 404(b). Licorish also challenges the court's reliance on Dr. Metz's testimony and the court's finding of fact describing his testimony. Finally, she claims that substantial evidence does not support the court's finding that she would be unable to adequately protect M.L.-L. from future abuse without services in place.

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The State has a corresponding interest in protecting the physical, mental, and emotional health of children. Id. Unlike a parental termination proceeding, a dependency hearing is "'a preliminary, remedial, nonadversary proceeding' that does not permanently

5

deprive a parent of any rights." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (quoting In re Dependency of A.W., 53 Wn. App. 22, 30, 765 P.2d 307 (1988)). The primary purpose of a dependency hearing "is to allow courts to order remedial measures to preserve and mend family ties." In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). In balancing the legal rights of parents against the rights of the child, the legislature has determined that the rights and safety of the child is the paramount concern. RCW 13.34.020; Schermer, 161 Wn.2d at 942.

Relevant here, Washington defines a "dependent child" as a child who "[h]as no parent . . . capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). Dependencies based on RCW 13.34.030(6)(c) do not require a finding of parental unfitness; instead, they "allow[] consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." Schermer, 161 Wn.2d at 944. The trial court's determination of dependency is necessarily highly fact specific; there are no specific factors that a court must consider when determining whether the child is dependent under RCW 13.34.030(6)(c). See Schermer, 161 Wn.2d at 952. The trial court has broad discretion in evaluating all of the evidence. Id.

We will affirm an order of dependency so long as substantial evidence supports the juvenile court's findings of fact and the findings support the conclusions of law. In re Dependency of M.S.D., 144 Wn. App 468, 478, 182 P.3d 978 (2008). Evidence is substantial if, when viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence. Id. In making this

determination, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of M.P., 76 Wn. App. 87, 91, 882 P.2d 1180 (1994). Unchallenged findings are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

I.    Evidence of Criminal History

Licorish contends that the juvenile court improperly admitted evidence of her adult and juvenile criminal history and relied upon that evidence to establish character and propensity. A juvenile court "has broad discretion in dependency and termination proceedings to receive and evaluate evidence in light of a child's best interest." d.at 728. Courts are particularly reluctant in dependency proceedings involving children's welfare to withhold relevant information from the trier of fact. Id. Accordingly, we will not disturb the court's ruling regarding the admissibility of evidence in a dependency proceeding absent an abuse of discretion. Id.

Licorish claims that the evidence of her criminal history was inadmissible under ER 404(b) which prohibits the admission of evidence of other crimes, wrongs, or acts to prove character or an action in conformity therewith. Licorish cites only a criminal case, however, and provides no authority or analysis regarding the applicability of ER 404(b) in the context of dependency proceedings. With regard to child placement decisions and termination proceedings, courts have concluded that criminal history is relevant and ER 404(b) is inapplicable. See In re Dependency of J.B.S., 123 Wn.2d 1, 11-12, 863 P.2d 1344 (1994) (criminal history is a relevant consideration with respect to placement of dependent child); In re Dependency of P.D., 58 Wn. App. 18, 792 P.2d 159 (1990) ("the circumstances that ER 404(b) seeks to prevent are not applicable in a termination

hearing"); In re Welfare of Gillispie, 14 Wn. App. 512, 517-18, 543 P.2d 249 (1975) (criminal history relevant in termination case to the issues of parental fitness, stability, and the child's welfare).

Moreover, contrary to Licorish's argument, there is nothing in the court's findings to suggest that the court relied on the criminal history evidence to find propensity to commit crimes or make a finding regarding her character. The court noted that involvement in the criminal justice system diverts time, focus, and resources away from parenting. Therefore, the court determined the criminal history was relevant to the overall stability and availability of the parents. The court merely found, accurately, that the parents' involvement in criminal matters had not ceased after the birth of their child, indicating that they had not "completely learned whatever it is they can learn to avoid those sort of interactions."[2] This is nothing more than a finding that the parents' involvement in the criminal justice system is a continuing pattern.

And, finally, the court's determination of dependency is not based on its finding that the parents have experience and continuing involvement in the criminal justice system. The critical findings supporting the determination of dependency are the findings that (1) M.L.-L.'s injuries caused several medical professionals to be concerned about abuse, (2) Licorish aligned herself with LaFantasie, and (3) despite the concerns and a court order, she allowed LaFantasie to have unsupervised contact with the child. Because we can uphold the determination of dependency without reference to the challenged evidence and factual finding, any error in the admission of the criminal

---

[2] Licorish had at least two convictions stemming from conduct that occurred after M.L.-L. was born.

8

history evidence was harmless in this case. See In re Welfare of X.T., 174 Wn. App. 733, 739, 300 P.3d 824 (2013) (erroneous admission of evidence in dependency proceeding not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred).

## II.    Reliance on Dr. Metz's Opinion

Licorish argues that the court should not have relied upon Dr. Metz's opinion because (1) he did not personally examine M.L.-L., (2) some of his findings differed from those of other medical personnel who physically examined the child, and (3) his opinion that the injury was not consistent with the reported accident was based on inaccurate and incomplete information.

Licorish's arguments all involve reweighing the evidence, which is not within the scope of our review. See In re M.P., 76 Wn. App. at 91 ("This court is not to weigh the evidence or the credibility of the witnesses."). In any event, in an unchallenged finding of fact, the court found that Dr. Metz and Dr. Diekema reached the same conclusion that the injury M.L.-L. sustained in April 2014 was not consistent with the report that he fell forward and hit his forehead on a cup holder. The court's finding that both medical professionals who saw M.L.-L.'s forehead injury in person were concerned about abuse is also unchallenged. It is true that Dr. Diekema and the public health nurse noted only raised bruising on the left side of the forehead. However, the GAL, who viewed the same photos as Dr. Metz, agreed that they showed bruising on both sides. The court was aware that Dr. Metz did not perform a physical examination, that neither physician received a report of the injury directly from the parents, and that both physicians based their opinions on a broad outline of facts provided by Licorish to the social worker.

Licorish also contends that finding of fact 10, regarding the substance of Dr. Metz's testimony, is unsupported by substantial evidence and misstates the testimony. Licorish argues that Dr. Metz's testimony that the injuries depicted in the photographs were "highly concerning for abuse" does not support the court's finding that Dr. Metz concluded that the markings were "consistent with purposeful trauma." We disagree. A reasonable inference from Dr. Metz's testimony is that the injuries were concerning for abuse precisely because they were consistent with nonaccidental trauma. Although the court rephrased Dr. Metz's language, the testimony supports the court's finding of fact.

III.    Finding of Dependency

Licorish contends that substantial evidence in the record does not support the court's finding that "[w]ithout services in place, the Court is concerned that the mother is not capable of protecting the child from future abuse." To the contrary, Licorish claims there is "ample and credible" evidence in the record of her fitness as a parent and ability to advocate for herself and her child. For instance, she points to evidence that she voluntarily sought supportive services by working with a public health nurse, evidence that she brought M.L.-L.'s bruising to the attention of his doctor, and evidence that M.L.-L. was bonded to her and was achieving appropriate developmental milestones while in her care. Licorish suggests that the court unfairly emphasized her reluctance to cooperate with CPS and the Department after the referrals to CPS and discounted her strengths to find a basis for dependency.

But, again, the Department did not need to prove that Licorish was unfit. Schermer, 161 Wn.2d at 944 (dependency does not turn on parental unfitness). The court's findings reflect its consideration of all the evidence, including the evidence of

Licorish's strengths as a parent. The court recognized that M.L.-L. was "developmentally on target," and that before the Department filed the dependency petition, Licorish had been "very good at seeking out help and support as a new mother." The court also found that Licorish loves her child and has "many strengths."

Nevertheless, the court also found that while there was no evidence that Licorish herself had abused M.L.-L., she had "aligned herself with the father, and despite the Court order, allowed the father to have unsupervised contact with the child, violating the Court's order." This finding is unchallenged. The evidence also showed that M.L.-L. had sustained bruising, on more than one occasion, that caused several health care providers to be concerned about potential abuse. Licorish was well aware of the concern. She admitted to Dr. Kim that she had considered whether LaFantasie had inflicted the injuries and discussed the matter with him. Then, after M.L.-L. sustained the forehead injury on April 1, Licorish failed to seek prompt medical attention for him, despite being strongly advised to do so by both the public health nurse and the social worker. Instead, she took him to the social worker's office three days later.

A dependency determination does not require proof of actual harm, only a danger of harm. Schermer, 161 Wn.2d at 951. " 'Nothing in the statute suggests that [the State] must stay its hand until actual damage to the endangered child has resulted.' " Id. (alteration in original) (quoting In re Welfare of Frederiksen, 25 Wn. App. 726, 733, 610 P.2d 371 (1979)). The juvenile court properly exercised its broad discretion here in assessing the risk of harm. The record supports the court's finding that Licorish ultimately chose to align herself with LaFantasie and compromised her ability to make decisions in the best interest of M.L.-L. The record also supports the

11

court's finding that there are legitimate reasons to question Licorish's ability to protect M.L.-L from future abuse in the absence of appropriate services and monitoring. These findings support the court's conclusion that Licorish is unable to adequately care for M.L.-L. such that there is a risk of substantial damage to his physical or psychological development, without any consideration of the ER 404(b) evidence.

In sum, Licorish fails to establish that the court abused its discretion by considering evidence of her criminal history. Substantial evidence in the record supports the challenged factual findings. The findings support the juvenile court's determination of dependency under RCW 13.34.030(6)(c).

Affirmed.

WE CONCUR: