# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of G.J.S., <br><br> A minor child. <br><br> STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, <br><br> Respondent, <br><br> v. <br><br> MARISA SMITH-SINGER, <br><br> Appellant. | No. 73909-3-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION <br><br><br><br><br><br><br><br> FILED: June 20, 2016 |

TRICKEY, J. — Marisa Smith-Singer appeals the trial court's order of dependency as to her infant daughter, G.J.S. Smith-Singer argues that the trial court deprived her of her statutory and due process rights by relying on materials outside the record when it determined that G.J.S. was dependent. Because the court's consideration of these materials is harmless beyond a reasonable doubt, we affirm.

## FACTS

In late 2014, Smith-Singer moved to Washington State to live with her father. She was pregnant at the time. Smith-Singer had previously been living in Tennessee. Smith-Singer testified that she left Tennessee for her own safety after her husband choked her. She moved to Washington to get back on her feet, get a job, gain independence, and raise her child.

Smith-Singer has two daughters in Tennessee. Both daughters reside with Smith-Singer's sister, who adopted them after the State of Tennessee removed the girls from Smith-Singer's care.

On February 20, 2015, Smith-Singer gave birth to G.J.S. Shortly after G.J.S.'s birth, medical staff and social workers grew concerned about Smith-Singer's behavior. They observed Smith-Singer talking to herself out loud and getting out of bed prematurely after her cesarean delivery. They believed that these behaviors could be attributed to a mental health issue that could compromise G.J.S.'s safety and health. Accordingly, they contacted the Department of Social and Health Services (Department).

On February 22, 2015, Smith-Singer agreed to a protective action plan with the Department. Under the plan, Smith-Singer's father, G.J.S.'s grandfather, was to have 24-hour supervision of G.J.S. or provide other appropriate childcare. In addition, Smith-Singer was to undergo a mental health evaluation.

On May 4, 2015, Smith-Singer violated this protective action plan when she left her father's house with G.J.S and went to a hotel. Law enforcement subsequently removed G.J.S. from Smith-Singer's care and placed her in protective custody.

The next day, the Department petitioned to have G.J.S. found dependent under RCW 13.34.030(6)(c). The Department alleged that G.J.S. had no parent, guardian, or custodian capable of adequately caring for her, such that G.J.S. was

in danger of substantial damage to her psychological or physical development. No actual or presumed father contested the Department's petition.[1]

At the initial shelter care hearing, the court ordered that G.J.S. remain in out-of-home care and that Smith-Singer's visits be supervised. During the next several months, Smith-Singer had supervised visits with G.J.S. three times per week at the Department's office.

On July 23, 2015, the court held a fact-finding hearing on the dependency petition. The court heard testimony from Smith-Singer; from Angel West, the visitation supervisor; and from Renee Boyd, a social worker. Both West and Boyd had observed visits between Smith-Singer and G.J.S.

West had supervised approximately 40 visits. She testified that during these visits, Smith-Singer was "extremely quiet," "non-verbal," and "withdrawn."[2] Despite the fact that G.J.S. was at an age where she wanted to be played with and talked to, West stated that there was "an extreme lack of conversation."[3] West testified that Smith-Singer did not engage in communication or physical play with G.J.S., but rather, she "default[ed] to feeding, and that's about it."[4]

West also testified that during Smith-Singer's visits, G.J.S. tended to get fussy and tried to wrestle out of her mother's arms. When this happened, West showed Smith-Singer how to talk to G.J.S., and G.J.S. would "instantly start to smile and get happy."[5] But Smith-Singer did not respond to West's suggestions.

---

[1] The trial court later entered default orders of dependency as to the father.
[2] Report of Proceedings (RP) (July 23, 2015) at 38-40.
[3] RP (July 23, 2015) at 39.
[4] RP (July 23, 2015) at 39.
[5] RP (July 23, 2015) at 40.

West also showed Smith-Singer how to hold G.J.S. when she had a stomachache. But Smith-Singer disregarded this suggestion as well. At the end of the visits, Smith-Singer did not say goodbye to G.J.S, which West testified was "completely and totally" unusual.[6]

Boyd testified similarly. Boyd described Smith-Singer as "very flat, very detached, [and] very unemotional."[7] Boyd never saw Smith-Singer speak, sing, or otherwise interact with G.J.S. When Boyd demonstrated how to talk or play with G.J.S., Smith-Singer did not respond. Smith-Singer also did not respond to Boyd's other suggestions. For example, during one visit, Smith-Singer changed G.J.S.'s diaper on a changing table and walked three feet away to retrieve something while G.J.S. was still strapped on the table. When Boyd told Smith-Singer to keep a hand on G.J.S. while she was on the table, Smith-Singer did not acknowledge that Boyd had said anything.

In Boyd's opinion, Smith-Singer is not able to safely care for G.J.S. at this time. Boyd explained that Smith-Singer is "not able to acknowledge the cues of [G.J.S.]"[8] When G.J.S. cries, Smith-Singer does not attempt to figure out what is wrong and does not interact with G.J.S. Boyd further explained that it is important for a parent to interact with a child of G.J.S.'s age because that is when the child is learning social skills and to form words, facial expressions, and different emotions. Boyd testified that Smith-Singer needed parenting classes to learn how

---

[6] RP (July 23, 2015) at 43.
[7] RP (July 23, 2015) at 57-58.
[8] RP (July 23, 2015) at 59-61.

4

to read G.J.S.'s cues, how to engage with G.J.S., and how to ensure G.J.S.'s safety.

At the end of the hearing, the court found that G.J.S. was a dependent child under RCW 13.34.030(6)(c). Specifically, the trial court found that G.J.S. had no parent, guardian, or custodian capable of adequately caring for her, such that she was in circumstances constituting a substantial danger to her psychological or physical development. The court stated that the "primary" issue was the risk of harm to G.J.S.'s psychological development.[9]

During its oral ruling, the trial court referenced an unidentified brief filed in an unrelated case. It also mentioned "information and research" about the effect of flat affect on a child:

> I was looking at some of my old stuff and there's a quote here that was interesting, and I think it goes to the heart of the matter here. The quote, and this is just a brief that I had, the writer of the brief said that simply because a parent is physically present and wants to care for the child does not necessarily mean that the parent is capable of meeting all of the child's needs. A parent must do more than simply be present. He or she must adequately care for the child's emotional, physical and developmental needs.
>
> And that's when we're talking about reading the cues. One of the primary pieces of evidence in this case is the flat affect. There's lots of information and research has shown that flat affect has [a] more powerful effect on a child than almost anything else. The other thing, though, is just reading the cues. Reading the cues to be able to tell from the child's behavior whether they need to play or whether they need to eat or whether they need to have their diaper changed is extremely important from a psychological development standpoint because that's how the child learns the world and to rely on the world as being something that is reasonable, benevolent and compassionate. When the child doesn't get those basic needs met and has to—and this is when you get to the part of the fussiness

---

[9] RP (July 23, 2015) at 72.

5

where the child starts to fuss and then goes into crisis from that, that's the evidence that there's a problem.[10]

Smith-Singer did not object to the trial court's references to this brief or to the "information and research" about the effect of flat affect on a child. Nor did she seek clarification as to the weight the court gave to these materials. Following the hearing, the trial court entered an order of dependency.

Smith-Singer subsequently appealed to this court. A commissioner of this court granted accelerated review and affirmed. Thereafter, a panel of this court granted Smith-Singer's motion to modify the Commissioner's ruling.

## ANALYSIS

For the first time on appeal, Smith-Singer argues that the trial court's consideration of evidence outside the record violated her statutory and constitutional due process rights to a fair trial. Specifically, she contends that the trial court erred by relying on a brief in an unrelated matter and on "information and research" about the effect of flat affect on a child.[11] We conclude that any error is harmless beyond a reasonable doubt.

"Parents have a fundamental liberty interest in the care and welfare of their minor children." In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). "However, the State has an interest in protecting the physical, mental, and emotional health of children." Schermer, 161 Wn.2d at 941. When a child's physical or mental health is seriously jeopardized by parental deficiencies, the State has a right and responsibility to intervene to protect the child. "'The primary

---

[10] RP (July 23, 2015) at 72-73.
[11] Br. in Support of Motion for Accelerated Review at 8-13.

purpose of a dependency is to allow courts to order remedial measures to preserve and mend family ties.'" Schermer, 161 Wn.2d at 943 (quoting In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005)).

The petitioner has the burden of establishing by a preponderance of the evidence that the child meets one of the statutory definitions of dependency set forth in RCW 13.34.030(6). Under RCW 13.34.030(6)(c), a dependent child means any child who "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." This definition of dependency "does not turn on parental 'unfitness' in the usual sense" or on parental misconduct. Schermer, 161 Wn.2d at 944. "Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." Schermer, 161 Wn.2d at 944.

Under RAP 2.5(a)(3), a claim of error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right. To raise a claim of error under this rule, an appellant must demonstrate (1) that the error is truly of constitutional dimension and (2) that it is manifest. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). If the appellant successfully shows that a claim raises a manifest constitutional error, then the burden shifts to the respondent to prove that, in the context of the entire record, the error is harmless beyond a reasonable doubt. State v. Grimes, 165 Wn. App. 172, 186, 267 P.3d 454 (2011).

7

Here, assuming that Smith-Singer has met her burden to show manifest constitutional error, we conclude that the asserted error is harmless beyond a reasonable doubt.

The Department presented evidence at trial about the effect of flat affect on a child. As discussed earlier, Boyd testified that it is important for a parent to interact with a child of G.J.S.'s age because that is when the child is learning social skills and to form words, facial expressions, and different emotions. Smith-Singer did not present any evidence to the contrary.

Moreover, as both the trial court's oral ruling and its written findings of fact indicate, Smith-Singer has several mental health and cognitive issues, in addition to her flat affect, that prevent her from being able to meet G.J.S.'s needs.

One issue identified by the trial court was Smith-Singer's inability to read G.J.S.'s cues. In its oral ruling, the trial court stated that the ability to read a child's cues is "extremely important from a psychological development standpoint . . . ."[12] The trial court's reliance on this factor is also evident in its written findings of fact. The trial court made several findings of fact about Smith-Singer's inability to read G.J.S.'s cues and the risks that this poses to G.J.S. In particular, the court found:

> 2.2.8 The primary issue is the risk the mother poses to [G.J.S.]'s psychological development. The risk to [G.J.S.]'s psychological development is seen in the mother's inability to read [G.J.S.]'s cues, her limited interaction with [G.J.S.], and possible mental health and cognitive issues.
>
> 2.2.9 At one visit, [G.J.S.] was crying but the mother did not respond. [G.J.S.] because very fussy. The mother was not able to calm her down. The visit supervisor stepped in to assist and calm her down.

---

[12] RP (July 23, 2015) at 72.

2.2.10 The mother is not able to differentiate between cues for playing, eating, and changing. Being able to distinguish between the child's various cues is very important, especially with an infant.

2.2.11 The risk to [G.J.S.]'s psychological development is also seen in the mother's various interactions with [G.J.S.]. She demonstrates that she uses a "default response" to [G.J.S.]'s various cues, rather than differentiating between them. She defaults to feeding [G.J.S.] instead of attempting to play or otherwise engage with her, even when [G.J.S.] is not hungry or demonstrates that she wants to play.

2.2.12 Parents that respond to cues with default responses create risk for a child because they ignore the need to read the specific environment and then react accordingly. When something happens that does not fit the default response, that creates actual risk to the child.

. . . .

2.2.14 During the mother's visits, she would hold and feed [G.J.S.], but not play with her, even when it was fairly apparent that [G.J.S.] wanted to crawl and play. Infants learn when they are playing and the mother was not able to engage with [G.J.S.] in play. Denying a child an opportunity to learn has a dramatic impact on the child's ability to grow and develop.[13]

Another issue that the trial court identified was Smith-Singer's inability to track conversations and respond to questions. The court stated that this suggested an inability to interact with the surrounding environment. This is also reflected in the trial court's written findings of fact:

2.2.16 The deficiency is also seen in how the mother struggles to interact with the world around her. The mother has difficulty tracking conversations and struggles responding to the actual questions she is asked. The social worker has observed the mother spacing out during conversations with her and not responding to questions. It is not clear whether this is a mental health issue or a cognitive ability issue, but this shows that there is a fairly significant problem to address.[14]

---

[13] Clerk's Papers (CP) at 70-71.
[14] CP at 71.

Finally, the court further identified a risk of physical harm to G.J.S. Specifically, the court found:

> 2.2.7 The mother poses a risk of physical harm to [G.J.S.] At one of the mother's supervised visits, she turned and left [G.J.S.] on the changing table while changing her diaper. This placed G.J.S. at risk of physical harm.[15]

None of these findings of fact are challenged on appeal. Accordingly, they are verities. State v. Gibson, 152 Wn. App. 945, 951, 219 P.3d 964 (2009). Moreover, as detailed earlier in this opinion, the testimony at trial provides ample evidence to support these findings.

As these findings indicate, Smith-Singer's flat affect was only one factor that the court relied on in making its dependency determination. The record is replete with evidence that Smith-Singer has multiple parental deficiencies and mental health and cognitive issues that prevent her from being capable of safely caring for G.J.S. and meeting G.J.S.'s needs at this time. Although we do not condone the trial court's behavior in this case, we conclude that any error is harmless beyond a reasonable doubt.

We affirm the order of dependency.

Trickey, A.C.J

WE CONCUR:

Leach, J.

Cox, J.

---

15 CP at 70.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of )
G.J.S., )
                    A minor child. )
                     )
STATE OF WASHINGTON, )
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES, )
                     )
               Respondent, )
                     )
           v. )
                     )
MARISA SMITH-SINGER, )
                     )
               Appellant. )

No. 73909-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 20, 2016

TRICKEY, J. — Marisa Smith-Singer appeals the trial court's order of dependency as to her infant daughter, G.J.S. Smith-Singer argues that the trial court deprived her of her statutory and due process rights by relying on materials outside the record when it determined that G.J.S. was dependent. Because the court's consideration of these materials is harmless beyond a reasonable doubt, we affirm.

## FACTS

In late 2014, Smith-Singer moved to Washington State to live with her father. She was pregnant at the time. Smith-Singer had previously been living in Tennessee. Smith-Singer testified that she left Tennessee for her own safety after her husband choked her. She moved to Washington to get back on her feet, get a job, gain independence, and raise her child.

Smith-Singer has two daughters in Tennessee. Both daughters reside with Smith-Singer's sister, who adopted them after the State of Tennessee removed the girls from Smith-Singer's care.

On February 20, 2015, Smith-Singer gave birth to G.J.S. Shortly after G.J.S.'s birth, medical staff and social workers grew concerned about Smith-Singer's behavior. They observed Smith-Singer talking to herself out loud and getting out of bed prematurely after her cesarean delivery. They believed that these behaviors could be attributed to a mental health issue that could compromise G.J.S.'s safety and health. Accordingly, they contacted the Department of Social and Health Services (Department).

On February 22, 2015, Smith-Singer agreed to a protective action plan with the Department. Under the plan, Smith-Singer's father, G.J.S.'s grandfather, was to have 24-hour supervision of G.J.S. or provide other appropriate childcare. In addition, Smith-Singer was to undergo a mental health evaluation.

On May 4, 2015, Smith-Singer violated this protective action plan when she left her father's house with G.J.S and went to a hotel. Law enforcement subsequently removed G.J.S. from Smith-Singer's care and placed her in protective custody.

The next day, the Department petitioned to have G.J.S. found dependent under RCW 13.34.030(6)(c). The Department alleged that G.J.S. had no parent, guardian, or custodian capable of adequately caring for her, such that G.J.S. was

2

in danger of substantial damage to her psychological or physical development. No actual or presumed father contested the Department's petition.[1]

At the initial shelter care hearing, the court ordered that G.J.S. remain in out-of-home care and that Smith-Singer's visits be supervised. During the next several months, Smith-Singer had supervised visits with G.J.S. three times per week at the Department's office.

On July 23, 2015, the court held a fact-finding hearing on the dependency petition. The court heard testimony from Smith-Singer; from Angel West, the visitation supervisor; and from Renee Boyd, a social worker. Both West and Boyd had observed visits between Smith-Singer and G.J.S.

West had supervised approximately 40 visits. She testified that during these visits, Smith-Singer was "extremely quiet," "non-verbal," and "withdrawn."[2] Despite the fact that G.J.S. was at an age where she wanted to be played with and talked to, West stated that there was "an extreme lack of conversation."[3] West testified that Smith-Singer did not engage in communication or physical play with G.J.S., but rather, she "default[ed] to feeding, and that's about it."[4]

West also testified that during Smith-Singer's visits, G.J.S. tended to get fussy and tried to wrestle out of her mother's arms. When this happened, West showed Smith-Singer how to talk to G.J.S., and G.J.S. would "instantly start to smile and get happy."[5] But Smith-Singer did not respond to West's suggestions.

---

[1] The trial court later entered default orders of dependency as to the father.
[2] Report of Proceedings (RP) (July 23, 2015) at 38-40.
[3] RP (July 23, 2015) at 39.
[4] RP (July 23, 2015) at 39.
[5] RP (July 23, 2015) at 40.

West also showed Smith-Singer how to hold G.J.S. when she had a stomachache. But Smith-Singer disregarded this suggestion as well. At the end of the visits, Smith-Singer did not say goodbye to G.J.S, which West testified was "completely and totally" unusual.[6]

Boyd testified similarly. Boyd described Smith-Singer as "very flat, very detached, [and] very unemotional."[7] Boyd never saw Smith-Singer speak, sing, or otherwise interact with G.J.S. When Boyd demonstrated how to talk or play with G.J.S., Smith-Singer did not respond. Smith-Singer also did not respond to Boyd's other suggestions. For example, during one visit, Smith-Singer changed G.J.S.'s diaper on a changing table and walked three feet away to retrieve something while G.J.S. was still strapped on the table. When Boyd told Smith-Singer to keep a hand on G.J.S. while she was on the table, Smith-Singer did not acknowledge that Boyd had said anything.

In Boyd's opinion, Smith-Singer is not able to safely care for G.J.S. at this time. Boyd explained that Smith-Singer is "not able to acknowledge the cues of [G.J.S.]"[8] When G.J.S. cries, Smith-Singer does not attempt to figure out what is wrong and does not interact with G.J.S. Boyd further explained that it is important for a parent to interact with a child of G.J.S.'s age because that is when the child is learning social skills and to form words, facial expressions, and different emotions. Boyd testified that Smith-Singer needed parenting classes to learn how

---

[6] RP (July 23, 2015) at 43.
[7] RP (July 23, 2015) at 57-58.
[8] RP (July 23, 2015) at 59-61.

4

to read G.J.S.'s cues, how to engage with G.J.S., and how to ensure G.J.S.'s safety.

At the end of the hearing, the court found that G.J.S. was a dependent child under RCW 13.34.030(6)(c). Specifically, the trial court found that G.J.S. had no parent, guardian, or custodian capable of adequately caring for her, such that she was in circumstances constituting a substantial danger to her psychological or physical development. The court stated that the "primary" issue was the risk of harm to G.J.S.'s psychological development.[9]

During its oral ruling, the trial court referenced an unidentified brief filed in an unrelated case. It also mentioned "information and research" about the effect of flat affect on a child:

> I was looking at some of my old stuff and there's a quote here that was interesting, and I think it goes to the heart of the matter here. The quote, and this is just a brief that I had, the writer of the brief said that simply because a parent is physically present and wants to care for the child does not necessarily mean that the parent is capable of meeting all of the child's needs. A parent must do more than simply be present. He or she must adequately care for the child's emotional, physical and developmental needs.
>
> And that's when we're talking about reading the cues. One of the primary pieces of evidence in this case is the flat affect. There's lots of information and research has shown that flat affect has [a] more powerful effect on a child than almost anything else. The other thing, though, is just reading the cues. Reading the cues to be able to tell from the child's behavior whether they need to play or whether they need to eat or whether they need to have their diaper changed is extremely important from a psychological development standpoint because that's how the child learns the world and to rely on the world as being something that is reasonable, benevolent and compassionate. When the child doesn't get those basic needs met and has to—and this is when you get to the part of the fussiness

---

[9] RP (July 23, 2015) at 72.

where the child starts to fuss and then goes into crisis from that, that's the evidence that there's a problem.[10]

Smith-Singer did not object to the trial court's references to this brief or to the "information and research" about the effect of flat affect on a child. Nor did she seek clarification as to the weight the court gave to these materials. Following the hearing, the trial court entered an order of dependency.

Smith-Singer subsequently appealed to this court. A commissioner of this court granted accelerated review and affirmed. Thereafter, a panel of this court granted Smith-Singer's motion to modify the Commissioner's ruling.

ANALYSIS

For the first time on appeal, Smith-Singer argues that the trial court's consideration of evidence outside the record violated her statutory and constitutional due process rights to a fair trial. Specifically, she contends that the trial court erred by relying on a brief in an unrelated matter and on "information and research" about the effect of flat affect on a child.[11] We conclude that any error is harmless beyond a reasonable doubt.

"Parents have a fundamental liberty interest in the care and welfare of their minor children." In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). "However, the State has an interest in protecting the physical, mental, and emotional health of children." Schermer, 161 Wn.2d at 941. When a child's physical or mental health is seriously jeopardized by parental deficiencies, the State has a right and responsibility to intervene to protect the child. "'The primary

---

[10] RP (July 23, 2015) at 72-73.
[11] Br. in Support of Motion for Accelerated Review at 8-13.

purpose of a dependency is to allow courts to order remedial measures to preserve and mend family ties.'" Schermer, 161 Wn.2d at 943 (quoting In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005)).

The petitioner has the burden of establishing by a preponderance of the evidence that the child meets one of the statutory definitions of dependency set forth in RCW 13.34.030(6). Under RCW 13.34.030(6)(c), a dependent child means any child who "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." This definition of dependency "does not turn on parental 'unfitness' in the usual sense" or on parental misconduct. Schermer, 161 Wn.2d at 944. "Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." Schermer, 161 Wn.2d at 944.

Under RAP 2.5(a)(3), a claim of error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right. To raise a claim of error under this rule, an appellant must demonstrate (1) that the error is truly of constitutional dimension and (2) that it is manifest. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). If the appellant successfully shows that a claim raises a manifest constitutional error, then the burden shifts to the respondent to prove that, in the context of the entire record, the error is harmless beyond a reasonable doubt. State v. Grimes, 165 Wn. App. 172, 186, 267 P.3d 454 (2011).

7

Here, assuming that Smith-Singer has met her burden to show manifest constitutional error, we conclude that the asserted error is harmless beyond a reasonable doubt.

The Department presented evidence at trial about the effect of flat affect on a child. As discussed earlier, Boyd testified that it is important for a parent to interact with a child of G.J.S.'s age because that is when the child is learning social skills and to form words, facial expressions, and different emotions. Smith-Singer did not present any evidence to the contrary.

Moreover, as both the trial court's oral ruling and its written findings of fact indicate, Smith-Singer has several mental health and cognitive issues, in addition to her flat affect, that prevent her from being able to meet G.J.S.'s needs.

One issue identified by the trial court was Smith-Singer's inability to read G.J.S.'s cues. In its oral ruling, the trial court stated that the ability to read a child's cues is "extremely important from a psychological development standpoint . . . ."[12] The trial court's reliance on this factor is also evident in its written findings of fact. The trial court made several findings of fact about Smith-Singer's inability to read G.J.S.'s cues and the risks that this poses to G.J.S. In particular, the court found:

> 2.2.8 The primary issue is the risk the mother poses to [G.J.S.]'s psychological development. The risk to [G.J.S.]'s psychological development is seen in the mother's inability to read [G.J.S.]'s cues, her limited interaction with [G.J.S.], and possible mental health and cognitive issues.
>
> 2.2.9 At one visit, [G.J.S.] was crying but the mother did not respond. [G.J.S.] because very fussy. The mother was not able to calm her down. The visit supervisor stepped in to assist and calm her down.

---

[12] RP (July 23, 2015) at 72.

2.2.10 The mother is not able to differentiate between cues for playing, eating, and changing. Being able to distinguish between the child's various cues is very important, especially with an infant.

2.2.11 The risk to [G.J.S.]'s psychological development is also seen in the mother's various interactions with [G.J.S.]. She demonstrates that she uses a "default response" to [G.J.S.]'s various cues, rather than differentiating between them. She defaults to feeding [G.J.S.] instead of attempting to play or otherwise engage with her, even when [G.J.S.] is not hungry or demonstrates that she wants to play.

2.2.12 Parents that respond to cues with default responses create risk for a child because they ignore the need to read the specific environment and then react accordingly. When something happens that does not fit the default response, that creates actual risk to the child.

. . . .

2.2.14 During the mother's visits, she would hold and feed [G.J.S.], but not play with her, even when it was fairly apparent that [G.J.S.] wanted to crawl and play. Infants learn when they are playing and the mother was not able to engage with [G.J.S.] in play. Denying a child an opportunity to learn has a dramatic impact on the child's ability to grow and develop.[13]

Another issue that the trial court identified was Smith-Singer's inability to track conversations and respond to questions. The court stated that this suggested an inability to interact with the surrounding environment. This is also reflected in the trial court's written findings of fact:

2.2.16 The deficiency is also seen in how the mother struggles to interact with the world around her. The mother has difficulty tracking conversations and struggles responding to the actual questions she is asked. The social worker has observed the mother spacing out during conversations with her and not responding to questions. It is not clear whether this is a mental health issue or a cognitive ability issue, but this shows that there is a fairly significant problem to address.[14]

---

[13] Clerk's Papers (CP) at 70-71.
[14] CP at 71.

Finally, the court further identified a risk of physical harm to G.J.S. Specifically, the court found:

> 2.2.7 The mother poses a risk of physical harm to [G.J.S.] At one of the mother's supervised visits, she turned and left [G.J.S.] on the changing table while changing her diaper. This placed G.J.S. at risk of physical harm.[15]

None of these findings of fact are challenged on appeal. Accordingly, they are verities. State v. Gibson, 152 Wn. App. 945, 951, 219 P.3d 964 (2009). Moreover, as detailed earlier in this opinion, the testimony at trial provides ample evidence to support these findings.

As these findings indicate, Smith-Singer's flat affect was only one factor that the court relied on in making its dependency determination. The record is replete with evidence that Smith-Singer has multiple parental deficiencies and mental health and cognitive issues that prevent her from being capable of safely caring for G.J.S. and meeting G.J.S.'s needs at this time. Although we do not condone the trial court's behavior in this case, we conclude that any error is harmless beyond a reasonable doubt.

We affirm the order of dependency.

_Trickey, ACJ_

WE CONCUR:

_Cox, J._

_Leach, J._

---

[15] CP at 70.