IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of G.C.B., DOB: 12/10/11, and M.J.B, DOB: 8/3/09, | No. 77943-5-I (Consolidated with No. 77944-3) |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| ROB BESH'STEEL, | |
| Appellant. | FILED: March 4, 2019 |

CHUN, J. — After a dependency of more than two years, the trial court terminated the father's parental rights to his two children.[1] As a basis for the termination, the court relied, in part, on the father's schizoid personality characteristics and the absence of a bonded, nurturing, and connected relationship with his children. But the father was not notified during the dependency that these issues were parental deficiencies that he would be required to defend against during the termination proceeding. Accordingly, we remand for the trial court to reconsider whether termination is appropriate based on the other parental deficiencies of which the father had notice.

---

[1] The children's mother relinquished her rights and entered into an open adoption agreement just before trial on the Department's petition. This appeal involves only the father's parental rights.

## BACKGROUND

M.J.B. was born in 2008 and her brother, G.C.B, was born in 2011. Child Protective Services became involved with the family in June 2015, when police responded to a report that three-year old G.C.B. was walking alone down a busy street. Police recognized G.C.B. from an incident 17 days prior, when he was found wandering alone in a motel parking lot, wearing only a t-shirt and a diaper. In the prior incident, the parents were in a nearby motel room, where the family was staying at the time, but had fallen asleep. This time, the parents were not in the vicinity, and had left G.C.B. in the care of his 12-year-old half-brother.[2]

The Department of Children, Youth and Families[3] (the Department) took G.C.B. and M.J.B. into protective custody and then placed them in licensed care.[4] Neither child has lived with their parents since that time.

When they came into the State's custody, the children appeared to be undernourished, lacking in appropriate hygiene, and social workers were concerned about their physical health. G.C.B. was admitted to the hospital due to concerns about his exposure to a serious infectious disease. Testing showed signs of "diffused bone mineralization," indicative of malnourishment and neglect. G.C.B. also had speech delays and was not toilet-trained. M.J.B. had deep cavities that required the removal of numerous teeth. The Department filed a

---

[2] Previously, when he was two years old, police found G.C.B. alone in traffic.

[3] Formerly the Department of Social and Health Services.

[4] The Department took all three children into custody, but only the parental rights as to G.C.B. and M.J.B are at issue in this appeal.

dependency petition, alleging that the parents neglected to care for the children and failed to attend to their medical needs.

In September 2015, after a contested hearing, the court entered orders of dependency. The court found that the children were dependent because: (1) they were abused or neglected; and (2) they had no parent, guardian or custodian capable of caring for them adequately. RCW 13.34.030(6)(b), (c). The court ordered the father to complete a psychological evaluation with a parenting component and follow any recommendations for further services, complete age-appropriate parenting instruction, participate in nutritional education, participate in all medical and dental appointments with the children, and submit to tuberculosis (TB) testing. The court's order allowed the father to have monitored visitation twice per month, once he completed the TB testing and was cleared for the illness.

In the year that followed, the father did not participate in any court-ordered services. Nor did he complete TB testing so that he could visit the children. Except for one visit the social worker permitted him by mistake, he did not see the children for more than a year. The father did not exercise the option, set forth in the dependency order, to participate in visitation by Skype or telephone until he could complete the testing.

In August 2016, when the children had been dependent for over a year, the Department filed a petition to terminate the parental rights of both parents. With respect to each child, the Department alleged that the father had not

participated in any court-ordered services and did not appear to be "capable of providing an adequate, stable and safe environment for the child despite an abundance of supportive community services." The petition stated that the "nature and extent of parental deficiencies and incapacities provide a reasonable explanation why the parents have not been able to develop appropriate parenting skills despite offered services." The Department further alleged:

> The mother and father are currently not fit to parent the child. The Department has identified the following parental deficiencies that have not been corrected and necessitate termination of parental rights as to the mother and father. The child came into care due to chronic and significant medical, emotional, and developmental neglect. Since that time the parents have consistently failed to learn parenting skills or address their mental health issues or attend services that would help them to understand and attend to the medical, emotional, physical, developmental needs of their child. For these reasons, the parents do not understand and are incapable of providing for their child's emotional, physical, mental and developmental needs; the parents are incapable of safely parenting the child.

At the time of the December 2017 trial on the Department's petition, M.J.B. was eight years old and G.C.B. was almost six years old. The father had not seen the children in eight months. The court heard evidence during the trial about the issues that led to the dependency. There was also evidence that after the Department filed the petition for termination, for a period lasting approximately eight months, the father engaged in some services and regularly visited the children. Then following an injury around April 2017, the father stopped engaging in the dependency and communicating with the Department.

The court also considered evidence regarding concerns about the father's lack of connection with his children and about certain personality traits he exhibited that potentially impaired his ability to nurture the children or meet their emotional and developmental needs.

A forensic psychologist, Dr. Evan Freedman, performed a psychological evaluation with a parenting component of the father in February 2017. As part of that evaluation, Dr. Freedman conducted a one-hour observation of the father. M.J.B. and G.C.B.

Based on that observation, Dr. Freeman testified that the children did not appear to be happy or excited to see their father and described the energy between them as "stilted." Dr. Freedman described the father's affect as "quite flat." He said the father "seemed quite distant from the children," interacted only minimally with them, and made no effort to help them, ensure their safety, or play with them. Dr. Freeman testified that he observed that the father did not engage in behaviors "designed to facilitate attachment" such as "reciprocal communication" and the children did not appear to have a "secure" attachment to him.

Dr. Freedman concluded that although the father appeared to be "normal from a cognitive perspective" he exhibited a number of "schizoid personality characteristics." He explained that these "personality characteristics" include detachment, a restricted range of emotion, coldness, and limited sociability or manifestation of pleasure. Dr. Freedman said these traits potentially impaired

the father's ability to "facilitate the type of attachment necessary to support his children" and likely rendered him unable to meet their needs. Dr. Freedman hypothesized that the father likely lacked the insight and motivation to change that would be required for any intervention to be helpful. Dr. Freedman also said that the father appeared to have little insight as to why the Department removed the children from his care and was unable to articulate what he might do differently to avoid the issues that led to the dependency.

The father testified that he did not receive Dr. Freedman's evaluation and no one discussed the results with him.

In closing argument, the Department's attorney argued that the father showed little interest during the dependency in being with his children, learning about their needs, or how to properly care for them. The Department further argued that the father's "schizoid tendencies" made him incapable of recognizing weaknesses and unable to make the changes he would need to make in order to become a fit parent. According to the Department, the fact that no one informed the father of the evaluation results prior to the termination trial was immaterial because he knew about the evaluation and could have asked his attorney about the report. In response, the father's attorney argued that if the Department had concerns about the potential for reunification based on the results of the psychological evaluation, then Department had an obligation to inform the father of what its concerns were and what he needed to do to address them.

At the conclusion of the trial, the court entered an order terminating the father's parental rights and written findings.[5] The court's findings identify, among other things, the father's lack of a connected relationship to the children and his "psychological diagnosis" as parental deficiencies that he failed to correct during the dependency that rendered him unfit to parent. Specifically, the court's findings state that the father's "identified" parental deficiencies included a "[l]ack of bonding, nurturing, connectivity and parental relationship as demonstrated by the visits." The court further found that the father's "psychological diagnosis cannot be simply overcome and renders him incapable of meeting the children's needs without a warm, nurturing, and loving partner," and noted that the mother was not available to co-parent.

The father appeals.

## ANALYSIS

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941-42, 169 P.3d 452 (2007). Parental rights cannot be abridged without due process of law. In re Dependency of A.M.M., 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014). In particular, due process requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing. A.M.M., 182 Wn. App. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)).

---

[5] The court entered an initial order with boilerplate findings at the conclusion of the hearing and later entered supplemental findings that incorporate the court's oral ruling.

7

Such notice is necessary "'to prevent surprise, helplessness and disadvantage.'" A.M.M., 182 Wn. App. at 791 (quoting Martin, 3 Wn. App. at 410).

The father alleges a due process violation because he was not notified during the dependency that either the absence of an emotional bond with his children, as demonstrated during visitation, or personality traits that impaired his ability to nurture them would be considered as a basis for terminating his parental rights. He relies on A.M.M., 182 Wn. App. at 790-91, and In re Parental Rights of F.M.O., 194 Wn. App. 226, 231-32, 374 P.3d 273 (2016).

In A.M.M., the trial court terminated the mother's parental rights based, in part, on a parental deficiency not identified in the dependency or termination petition. A.M.M., 182 Wn. App. at 791-92. During the dependency, the Department focused on the mother's substance abuse issues. But during the termination hearing, the mother learned of another parental deficiency that could support termination when a social worker testified that the mother lacked an understanding of her children's needs. A.M.M., 182 Wn. App. at 784. This court reversed the termination order and remanded for the trial court to strike the finding that the mother's parental deficiencies included a lack of knowledge about her children's developmental needs. A.M.M., 182 Wn. App. at 792. While there were numerous findings about the mother's substance abuse, the trial court did not indicate that substance abuse alone was sufficient to warrant termination. On remand, we instructed the trial court to consider whether "termination is

appropriate on the basis of the parental deficiencies of which [the mother] was given adequate notice." A.M.M., 182 Wn. App. at 793.

In F.M.O., the Department took custody of an infant who tested positive for drugs at birth and initiated dependency proceedings, alleging parental deficiencies of substance abuse, mental health, and a domestic violence history. 194 Wn. App. at 227. In terminating the mother's parental rights, the court also cited the mother's recurring incarceration, which inhibited her ability to parent, as an additional basis supporting the termination. F.M.O., 194 Wn. App. at 229. While rejecting the mother's position that parental deficiencies are limited to those expressly identified in the termination or dependency petition, Division Three of this court concluded there was nothing in the record to indicate that the mother was notified that her frequent incarceration was a deficiency that could be the basis for terminating her rights. F.M.O., 194 Wn. App. at 232. As in A.M.M., the court reversed the termination order and instructed the trial court on remand to consider whether termination was appropriate based on the identified deficiencies. F.M.O., 194 Wn. App. at 233.

The relevant circumstances here are analogous to those in A.M.M. and F.M.O. While the Department notified the father that his parental deficiencies stemmed from chronic neglect of his children and the failure to supervise them, it did not apprise him that the court could terminate his parental rights because of schizoid personality traits or because he lacked a connected, nurturing, and bonded relationship with his children. There is no evidence in the record to

suggest that visit supervisors, or anyone else, raised concerns about the nature of the father's interaction or bond with the children during visitation. To the contrary, during the period of the dependency when the father had stable housing and was engaged in services and regularly visiting the children, the Department considered the possibility that the children could be returned to him. And, as explained, there is no evidence that the Department shared any concerns with the father about his interaction or relationship with the children based on the psychologist's evaluation. There is nothing in the record to indicate that, prior to the termination trial, the Department identified a lack of a bonded relationship with his children as a parental deficiency. Likewise, there is no evidence that prior to trial, the Department identified a psychological diagnosis or "schizoid" personality characteristics as a condition that rendered him incapable of parenting without the support of a "nurturing" partner.

The Department points out that the psychologist did not officially diagnose the father with a disorder and the court did not explicitly identify schizoid disorder as a parental deficiency. But regardless of whether the psychologist rendered a diagnosis or whether the court designated the issue as a deficiency, the court clearly concluded that the father's psychological condition rendered him unfit to parent on his own and was a barrier to reunification. A condition that prevents reunification constitutes a parental deficiency. See In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). As such, the father was entitled to

10

notice that the court could rely on this condition as a basis to terminate his parental rights.

The Department's vague reference in the termination petition to the failure to "learn parenting skills" or address "mental health issues" did not inform the father that his parental rights were in jeopardy specifically because of a schizoid personality disorder or characteristics or because of the lack of emotional connection to his children. And it is unclear what mental health issue the Department's petition referred to since the psychologist did not complete the evaluation until several months after the Department filed the termination petition.

While the Department may have offered services that had potential to impact or address the alleged deficiencies, this does not equate to notice of what deficiencies the Department will rely on. The requirements of due process are more exacting. As the court stated in F.M.O., both sides "need to know what deficiencies are at issue since the State has to prove the deficiencies to make its case while the parent has to know what allegations to defend against." 194 Wn. App. at 232. The record does not indicate that the Department notified the father in any manner prior to trial that the court could terminate his parental rights based on the absence of a bonded relationship with his children or on a diagnosis and/or character traits that could impair his ability to meet his children's emotional needs.

Reliance on a lack of bonding and schizoid traits as bases for termination was error. And despite other findings addressing identified deficiencies, in the

absence of evidence that the other deficiencies established at trial justified termination, we must remand. The trial court must consider whether termination is appropriate on the basis of the parental deficiencies of which the father was properly notified. Therefore, we need not address the father's alternative argument that the Department failed to offer services specifically tailored to address insufficient bonding and his schizoid disorder. See RCW 13.34.180(1)(d). We also need not address the father's challenge to the evidence supporting the court's finding that his parental deficiencies are unlikely to be remedied so that the children can be returned to him in the near future.[6] See RCW 13.34.180(1)(e).

We reverse and remand to the trial court for further proceedings.

_Chun, C.J._

WE CONCUR:

_Andrus, J._                    _Leach, J._

---

[6]Although the court must reevaluate the likelihood that conditions cannot be remedied with respect to the deficiencies of which the father had notice, we note that the father's challenge is partly based on the claim that the court could not make this finding in the absence of explicit witness testimony as to what duration of time constitutes the near future for each child. The father provides no authority to support the position that specific witness testimony on that point is required.